[No. B106181. Second Dist., Div. Seven. Feb. 18, 1997.]

AZUSA LAND RECLAMATION COMPANY, INC., Plaintiff and Appellant, v.
MAIN SAN GABRIEL BASIN WATERMASTER et al., Defendants and Respondents.

1168

1172

COUNSEL

McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCursh, Steven W. Weston, Edward J. Casey, Edward P. Manning, Brobeck, Phleger & Harrison, Michael E. Molland, Thomas M. Peterson and Marilyn Fisher for Plaintiff and Appellant.

Jeffrey Kightlinger, Morrison & Foerster, Burton J. Gindler, John Sobieski, Mark R. McDonald and Lester I. Yano for Defendants and Respondents.

OPINION

WOODS, J.—

I

INTRODUCTION

In view of the length and complexity of the opinion, we deem it necessary to give an expansive preview of the subject matter in the introduction.

This matter came to this court initially when Azusa Land Reclamation Company, Inc., filed a "petition for writ of mandate joined with request for stay or, *alternatively*, appellant's opening brief joined with petition for writ of supersedeas and application for expedited appeal . . . ." On October 11, 1996, this court issued an order requesting respondents to file a response to the petition of appellant. Following the filing of the response, this court issued an order denying the petition for writ of supersedeas and further ordering the filing of a respondents' brief and permitting the filing of a reply brief by appellant.

The Main San Gabriel Groundwater Basin (the Basin) is an underground reservoir that supplies the water needs of approximately 1,000,000 Southern Californians and is a vital link in California's statewide water planning. The Legislature, observing that municipal solid waste landfills located in empty sand and gravel quarries atop the Basin are believed to have contributed to the pollution of the Basin, has prohibited new or expanded landfills in sand and gravel pits—even if the landfill were to have a liner designed to capture pollutants before they hit the Basin.

The Azusa landfill, owned by appellant, Azusa Land Reclamation Company, Inc. (ALR), is an 80-acre *unlined* municipal solid waste landfill

located in an empty sand and gravel pit atop the Basin. In 1991, the State Water Resources Control Board (the State Board) rescinded the permit allowing the disposal of municipal solid waste at the site and ordered that further discharge at the site would be henceforth limited to inert waste because of the unsuitability of the site for a municipal solid waste dump. Accordingly, the landfill closed.

In 1994, after all of its challenges to the 1991 State Board order had failed, ALR announced that it would reopen the unlined 80-acre area and deposit 3,200,000 tons of municipal sold waste over a 7-year period. The State Board refused to stand in the way, deciding that the rescission of the earlier permit had only served to reinstate a permit issued in 1960. The State Board did, however, order ALR to submit a report of waste discharge by October 1995 and directed the Regional Water Quality Control Board for the Los Angeles region (the Regional Board) to decide whether to authorize the additional disposal.

In April 1995, the Regional Board decided to defer a decision until October 1995, after concluding that it could not allow ALR to dump 3,200,000 more tons of garbage at the site unless ALR proposed some sort of mitigation measures to overcome the obvious site deficiencies. The Main San Gabriel Basin Watermaster (Watermaster), the Metropolitan Water District of Southern California (Metropolitan), several municipal water districts, several elected officials, and numerous members of the public opposed the issuance of a new permit. Metropolitan retained several world-renowned experts to review ALR's proposal and, before the October public meeting, its experts submitted reports concluding that ALR's proposed mitigation measures would not work. ALR disagreed. After looking at all the evidence, Regional Board staff concluded that the impact of ALR's dumping—*even with ALR's proposed mitigation measures*—could be "significant."

On October 30, 1995, the Regional Board held a public meeting. After listening to comments from the public, the board closed the public comment period and then voted five to four to adopt an order that authorized the continued disposal of municipal waste at the site and that simultaneously declared the project exempt from the California Environmental Quality Act (CEQA). The State Board dismissed the petitions for failing to state a "substantial issue."

The trial court reversed the Regional Board's decision, concluding that CEQA applied because there was substantial evidence that the project would have a significant effect on the environment. ALR filed a timely notice of appeal. The State Board did not appeal.

## II

### CONTENTIONS

ALR contends the trial court erred: (1) by granting respondents relief when they failed to exhaust their administrative remedies by raising CEQA issues before the Regional Board; (2) by mistakenly applying the "significant effect" exemption to the existing facility categorical exemption; (3) by not applying the "ongoing project" exemption which should have been applied by the Regional Board; and (4) by failing to agree the landfill permit did not constitute a "project" under CEQA.

Respondents contend they have exhausted their administrative remedies and the trial court properly found that the "significant effect" exception applies. They further contend that the public policy goals of CEQA, environmental review, full disclosure and informed decisionmaking, have been upheld by the trial court's decision. Respondents contend that CEQA was not enacted for the purpose of granting a permit authorizing pollution while the project manager experiments with mitigation measures to reduce the suspected environmental impacts of the continued pollution—all without any environmental review.

## III

### FACTUAL AND PROCEDURAL BACKGROUND

*The Parties.*

Appellant, ALR, is a company engaged in the business of waste disposal, and owns and operates the landfill.

Respondent, Watermaster, is a nine-member board established by the Los Angeles Superior Court to implement its 1973 judgment adjudicating water rights in the Basin.

The State Board was a respondent in the trial court proceedings but elected not to appeal the judgment or file a brief in this appeal.

The following public water supply agencies are respondents in this appeal: Metropolitan; the San Gabriel Valley Municipal Water District (Four Cities); the Upper San Gabriel Valley Water District (Upper District) ; and the Three Valleys Municipal Water District (Three Valleys). For purposes of brevity, all of these respondents will be collectively referred to as the "Water Agencies."

*The Main San Gabriel Water Basin.*

The Basin's groundwaters are beneficially used for municipal, industrial, and agricultural water supply. The Basin produces approximately 200,000 acre-feet of water annually, supplying "drinking water for the lion's share of the San Gabriel Valley's more than 1,000,000 residents." (*Main San Gabriel Basin Watermaster* v. *State Water Resources Control Bd.* (1993) 12 Cal.App.4th 1371, 1374 [16 Cal.Rptr.2d 288].) Forty-six separate municipal water departments, private water companies, and other water agencies rely upon the Basin as a continuous source of high-quality water.

In addition to its value as a source of water, the Basin is an irreplaceable natural water storage facility. The estimated total capacity of the Basin is more than 10,000,000 acre-feet and has an unused storage capacity of at least 400,000 to 500,000 acre-feet. Substantial amounts of water are imported at considerable expense, spread at recharge[1] areas adjacent to the Azusa landfill, and stored in the Basin for use in times of need. Regrettably, the Basin is polluted. "[P]ollution of the Basin already poses a significant threat to public health, and consequently, the Basin is on the United States Environmental Protection Agency's (EPA) national priority list for cleanup under the federal superfund program." (*Main San Gabriel Basin Watermaster* v. *State Water Resources Control Bd.*, *supra*, 12 Cal.App.4th at pp. 1374-1375.)

The Legislature has characterized the Basin contamination problem as "urgent." (Stats. 1989, ch. 736, § 1, p. 2433.) Observing that "[t]he existence of landfills [atop the Basin] are believed to have contributed significantly to this groundwater contamination," (*ibid.*) the Legislature in 1989 prohibited any new or expanded municipal solid waste landfills in former sand and gravel pits atop the Basin. (Pub. Resources Code, § 40060.)

*The ALR Landfill Site.*

The unlined 80-acre area lies within an active sand and gravel quarry. The site comprises 302 acres within the cities of Azusa and Irwindale. The property consists of (a) the unlined 80-acre area; (b) a 22-acre *lined* portion where only *inert* waste may be deposited; and (c) a 200-acre area consisting primarily of sand and gravel operations. The Legislature, the courts, and the state and regional water quality control boards have declared that the Azusa Landfill site is particularly ill-suited for the disposal of waste.

---

[1]"Recharge" is "the natural or artificial replenishment of groundwater storage by percolation or injection of one or more sources of water at the surface." (Stats. 1982, ch. 1023, § 321, p. 3736.) "Recharge is an effective way to maximize availability of scarce water supplies throughout the state." (Wat. Code, § 12926, subd. (a).)

The landfill sits in a unique "geologic setting . . . ideally suited to receive, store, and transmit large volumes of potable water." The landfill is located on rock debris, deposited by the San Gabriel River. "[T]he material is highly permeable and will transmit water readily."

The permeability of the geologic material beneath and near the landfill makes the area ideal for recharging the Basin. It is surrounded by important recharge areas. To the north is the San Gabriel Canyon recharge area; one mile west is the San Gabriel river and the Santa Fe spreading grounds; and to the south is the Irwindale recharge site. Just as water rapidly percolates in the Basin, so do liquid contaminants from the landfill, known as "leachate,"[2] making the site the worst location for a landfill. In 1993, the Court of Appeal observed that "It is undisputed that the ALR landfill sits on a sand and gravel quarry, which renders the site particularly inappropriate for waste disposal." (*Main San Gabriel Basin Watermaster* v. *State Water Resources Control Bd.*, *supra*, 12 Cal.App.4th at p. 1377, fn. 3.) In the words of the State Board, "Logically, an environment suited for rapid ground water recharge is the least suited for waste disposal."

Regional Board order No. 95-151 authorizes ALR to deposit "municipal solid waste" in the unlined 80-acre area. Although "[s]uch waste is nominally classified 'nonhazardous' under the current regulatory scheme . . . . [it] typically contains known contaminants found in many commonly used household and automobile-related products. Leachates from the decomposition of such nonhazardous solid waste can render groundwater unfit for domestic purposes." (*Main San Gabriel Basin Watermaster* v. *State Water Resources Control Bd.*, *supra*, 12 Cal.App.4th at p. 1374.)

*Background.*

A. *Commencement of landfilling at the site.*

According to the Environmental Protection Agency (EPA), " '[L]andfilling began [at the site] . . . in about 1952, before liners, containment structures, leachate collection or removal systems, or leak detection systems were commonly used or required, so the [site has] none of these features.' " In 1959, the Legislature enacted former Water Code section 13054.1 which required persons discharging sewage (defined to include any waste associated with human habitation) or industrial waste to file a report on waste

---

[2]"Leachate" is "any liquid fluid, formed by the drainage of liquids from waste or by the percolation of flow of liquid through waste. It includes any constituents extracted from the waste and dissolved or suspended in the fluid." (Cal. Code Regs., tit. 23, § 2601.)

discharge with the local regional water pollution control board, which was directed to prescribe requirements as to the nature of the discharge. (Stats. 1959, ch. 1299, § 15, p. 3453.) Unlike a regional water quality control board today, a regional pollution control board in 1959 lacked the authority to prohibit, or even limit the volume of, discharge of sewage or industrial waste to land *anywhere* in California. (Stats. 1959, ch. 1299, § 18, p. 3453; 48 Ops.Cal.Atty.Gen. 85, 88 (1966).)

On February 11, 1960, the regional water pollution control board for the Los Angeles region, having no authority to do otherwise, prescribed requirements authorizing Azusa Rock and Sand Company to deposit "ordinary household and commercial refuse," and "nonwater soluble nondecomposable inert solids" at the landfill. (Res. No. 60-22.)

B. *Passage of the Porter-Cologne Water Quality Control Act of 1969.*

As California's population grew and the adverse environmental impacts associated with that growth were recognized, the Legislature enacted numerous new laws to protect California's water resources. In 1961, the Legislature enacted the Porter-Dolwig Ground Water Basin Protection Law, finding "that the greater portion of the water used in this State is stored, regulated, distributed and furnished by its ground water basins, and that such basins are subject to critical conditions of . . . degraded water quality causing great detriment to the peace, health, safety and welfare of the people of the State." (Wat. Code, § 12922.1.)

The law governing the production of water quality changed significantly in 1969 with the passage of the Porter-Cologne Water Quality Act, a comprehensive legislative plan for protecting the quality, and thus maximizing the beneficial use, of California's waters. (Stats. 1969, ch. 482, § 18, p. 1051.) The Porter-Cologne Water Quality Act provides: "The Legislature finds and declares that . . . the *quality of all the waters of the state shall be protected* for use and enjoyment by the people of the state." "[A]ctivities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality which is reasonable . . . ." (Wat. Code, § 13000, italics added.)

The regional water quality control boards were required (i) to establish water quality objectives that "will *ensure* the reasonable protection of beneficial uses" of state waters (Wat. Code, § 13241, italics added), and (ii) prescribe waste discharge requirements (WDR's) governing discharges to land and waters within the regions. In addition, the Porter-Cologne Water

Quality Act gave the regional water boards authority to specify "areas where the discharge of waste, or certain types of waste, will not be permitted." (Wat. Code, § 13243.)

C. *1982 emergency amendment to Porter-Cologne to protect against the threat posed by waste disposal sites.*

In 1982, the Legislature enacted emergency legislation to amend the Porter-Cologne Water Quality Act to protect against the threat that landfills pose to the State's water resources. (Stats. 1982, ch. 90, § 4, p. 291, eff. Mar. 2, 1982.) The 1982 legislation required the State Board to "(a) Classify wastes according to the risk of impairment to water quality . . . . [¶] (b) Classify the types of disposal sites according to the level of protection provided for water quality, taking into account the geology, hydrology, topography, climatology, and other factors relating to ability of the site to protect water quality. [¶] (c) Adopt standards and regulations to implement Sections 13226 and 13227." (Wat. Code, § 13172.)

Water Code section 13226 required regional boards to review and classify all *currently* operating waste disposal sites.

In 1984, the State Board adopted a comprehensive regulatory scheme (Chapter 15) that established three categories of waste management units, based on their ability to contain wastes, and four categories of waste based on an assessment of the potential risk of water quality degradation associated with each category of waste. (Cal. Code Regs., tit. 23, § 2520, subd. (a)(2).) Each category of waste (with the exception of inert waste) may be discharged only to a suitably classified waste management unit. (Cal. Code Regs., tit. 23, § 2520, subd. (a)(2).) Municipal solid waste (MSW) denominated "Nonhazardous Solid Waste" or "Class III" waste (Cal. Code Regs., tit. 23, § 2523) may be discharged at a new or existing Class III waste manage unit "where soil characteristics, distance from waste to ground water, and other factors will *ensure* no impairment of beneficial uses of . . . ground water beneath or adjacent to the landfill." (Cal. Code Regs., tit. 23, § 2533, subd. (b)(1), italics added.) Class III landfills must have "containment structures which are capable of preventing degradation of waters of the state as a result of waste discharges to the landfills if site characteristics are inadequate." (Cal. Code Regs., tit. 23, § 2540, subd. (c).) These siting and containment requirements apply to both new and existing landfills. (Cal. Code Regs., tit. 23, § 2510, subd. (d).)

Existing waste management units were given five years to show compliance with the new, tough regulations and obtain new operating permits, or

prepare for closure under new regulations adopted at the same time. (Cal. Code Regs., tit. 23, § 2510, subd. (d).) The regulations allowed discharges to "operate existing waste management units under existing classifications and waste discharge requirements until those classifications and requirements are reviewed in accordance with [California Code of Regulations, title 23, section 2591, subdivision (c)]. . . . Pending review and reclassification . . . dischargers are required to develop monitoring programs . . . and shall submit such programs to regional boards for approval." (*Ibid.*) Regional boards were instructed to consider the results of such monitoring programs (Cal. Code Regs., tit. 23, § 2510, subd. (e)), and to "fully review[]" "[W]aste management unit classifications and waste discharge requirements." (Cal. Code Regs., tit. 23, § 2591, subd. (c).)

In short, the Porter-Cologne Water Quality Act, the 1982 amendments regarding classification of wastes and sites, and the 1984 Chapter 15 regulations which implemented the 1982 legislation worked a major change in the law from that which existed in 1960 when Resolution No. 60-22 was issued by the former regional water pollution control board. Whereas that board could not prohibit the discharge of sewage to land anywhere, the new regional water quality control boards were directed to ensure that within five years *only* landfills that ensured nonimpairment of water were accepting municipal solid waste.

D. *Regional Board order No. 86-59 limited Resolution No. 60-22 pending the implementation of the new regulations.*

In 1986, the Regional Board issued Regional Board order No. 86-59 to ALR (Order No. 86-59). It said that *"Pending the full implementation* at this site of the new requirements of [Chapter 15] . . . the disposal of Class III wastes should be limited to [the unlined 80-acre area]."

ALR claims that the Regional Board "reclassified" the unlined 80-acre area as a Class III landfill in 1986 when it issued Order No. 86-59. For the reasons explained below, we find ALR's claim to be erroneous, but this court does not have to decide what the Regional Board's intent was in 1986 when it issued Order No. 86-59. In 1994, the State Board concluded that Order No. 86-59 did *not* reclassify the unlined 80-acre area under the Chapter 15 regulations, and instructed the Regional Board to do so. In response to the State Board's instruction, the Regional Board issued Regional Board Order No. 95-151, the order that is the subject of this suit.

The State Board's conclusion that Order No. 86-59 did not reclassify the site pursuant to the 1984 regulations is correct. *First,* Order No. 86-59 does

not say that it classified the unlined 80-acre area as a Class III landfill. By contrast, when the Regional Board did later classify the landfill as a Class III landfill, it explicitly said so in unmistakable terms at the outset of its order. (See Regional Bd. order No. 88-133 ["1. Azusa Land Reclamation Landfill is a Class III landfill."]; Regional Board order No. 95-151 ["A.1. ALRC may continue disposing MSW in the 80-acre unlined portion only . . . as an interim Class III landfill . . . ."].)

*Second,* by its terms Order No. 86-59 was issued "[p]ending the full implementation at this site" of the new regulations. Order No. 86-59 explicitly says that Chapter 15 had not been implemented at the site. Order No. 86-59 also does not purport to impose the new Chapter 15 regulations on ALR. Again, by contrast, the Regional Board explicitly directed in issuing Order No. 88-133 that "This site shall comply with all applicable provisions, requirements, and procedures contained in [Chapter 15]."

*Third,* there is nothing in Order No. 86-59 that indicates that, in issuing the order, the Regional Board undertook the review mandated by the 1984 regulations, namely, a determination whether the site met the siting criteria, or that ALR had proposed an engineered alternative that overcame the site deficiencies. ALR claims that it had proposed a "groundwater monitoring program" as an engineering alternative. We find no support in the record for this claim. ALR implemented a groundwater monitoring program because it was *ordered* to do so in order that the Regional Board could use the data in deciding whether to reclassify the site. (Cal. Code Regs., tit. 23, § 2510, subd. (d).) ALR does not refer to anything in the record that supports the claim that its groundwater monitoring program was a proposed "engineered alternative" that would itself *"ensure"* non-impairment of groundwater quality. A program to sample and analyze groundwater cannot prevent pollution, it can only measure it. More importantly, there is nothing in Order No. 86-59 that suggests that the Regional Board, by issuing Order No. 86-59, found the groundwater monitoring program would ensure non-impairment.

E. *The site was reclassified in 1988 by Regional Board order No. 88-133, but order No. 88-133 was rescinded or severely limited in 1991.*

After Order No. 86-59 issued, ALR began the process of obtaining revised waste discharge requirements. In December 1986, ALR represented to the Regional Board that it had overestimated the remaining capacity in the unlined 80-acre area. " 'Instead of 4.9 years remaining, only 3 years are left.' " ALR thus focused on the proposed expansion of the site.

In 1988, the Regional Board issued Regional Board order No. 88-133 (Order No. 88-133) which *did* classify the unlined 80-acre area as well as the remaining 220 acres of the site,[3] as a Class III landfill, and implemented numerous new requirements over the landfill's operations. The Regional Board initially denied revised waste discharge requirements for the expansion area, but after ALR offered to install additional protective measures, the board approved the project and issued waste discharge requirements to govern the entire 300-acre site.

Watermaster and the other Water Agencies opposed Order No. 88-133, and petitioned the State Board to review it. Watermaster also sought to stay Order No. 88-133 to prevent ALR from depositing waste in the expansion area. ALR opposed the stay, representing to the State Board that "ALR needs to begin disposal activities in the [expansion] zone within the next 30 to 45 days . . . . ALR is very near the end of the available space in its unlined landfill area." The State Board denied a stay and later modified Order No. 88-133 by issuing State Board order No. 89-17, but otherwise approved the issuance of waste discharge requirements for the site as a Class III landfill.

Watermaster and the other Water Agencies brought a mandate proceeding to challenge State Board order No. 89-17. In 1991, the Court of Appeal found that the State Board erred in approving an expansion of the site without first preparing an environmental impact report (EIR) to consider the impact of expansion and the superior court issued a peremptory writ of mandate that (i) vacated State Board order No. 89-17 and (ii) prohibited further disposal outside the unlined 80-acre area pending compliance with CEQA.

The State Board then undertook a further review of the site, which resulted in State Board order No. 91-09. In the order, the State Board observed that "[t]here is virtually no capacity remaining in [the unlined 80-acre area] . . . . The landfill is virtually shutdown at the present time. *Only inert wastes may be discharged.*" (Italics added.)

The State Board order dealt with the following contention and made the following finding: "1. *Contention*: Petitioner and other interested persons contend that further use of the landfill for other than the disposal of inert wastes should be denied. They contend that such use poses an unacceptable risk to ground water quality of an already polluted basin. [¶] *Finding*: For the reasons discussed below, we find that further discharges of nonhazardous waste at the landfill do pose an unacceptable risk to water quality. We, therefore, find that such discharges should be prohibited." (State Bd. order

---

[3]Order No. 88-133 "establishe[d] revised waste discharge requirements for the *continued operation* and expansion of an existing landfill." (State Bd. order No. 89-17.)

No. 91-09, fns. omitted.) Likewise, in section III of State Board order No. 91-09, "Conclusions," the State Board concluded that "[t]he further discharge of nonhazardous waste at the Azusa landfill should not be permitted." Finally, order No. 91-09 provided that "Waste Discharge Requirement order No. 88-133 . . . is rescinded except as it authorizes the disposal of inert wastes" and "the Regional Board [shall] consider what additional measures are appropriate to regulate the existing landfill."

ALR challenged State Board order No. 91-09 in several ways. First, ALR claimed that the State Board was required to comply with CEQA before denying waste discharge requirements. One of ALR's main arguments was that an impending trash crisis would be accelerated if the ALR landfill is closed to Class III waste, so CEQA required the State Board to prepare an EIR before issuing State Board order No. 91-09. We are unable to find support in the record that ALR advised the trial court or the Court of Appeal that there was seven years' capacity remaining in the unlined eighty-acre area. The trial court and the Court of Appeal rejected that claim. (*Main San Gabriel Basin Watermaster* v. *State Water Resources Control Bd.*, *supra*, 12 Cal.App.4th 1371.) ALR also filed a separate action claiming that the State Board, by issuing order No. 91-09, violated the Porter-Cologne Water Quality Act. The trial court rejected that claim and the court's decision became final in February 1994 after ALR elected not to appeal.

F. *In 1994, ALR announced it would begin dumping 3,200,000 tons of municipal garbage in the unlined area.*

Watermaster and the Water Agencies assert that they believed that the matter of the Azusa landfill was closed but, were dismayed when, ALR unexpectedly announced in April 1994 that it had discovered *seven years'* additional capacity in the unlined eighty-acre area, and would begin filling the remaining capacity in May 1994. Watermaster immediately contacted the Regional Board and reminded it that State Board order No. 91-09 limited disposal at the site to inert waste and asked the Regional Board, therefore, to prohibit the disposal of Class III waste, at least until the Board could consider whether ALR had authority to accept such waste. The Regional Board asked the State Board for guidance.

Watermaster immediately petitioned the State Board to review the Regional Board's failure to act. The petition contained arguments that (1) Order No. 88-133, as limited by State Board order No. 91-09, governed the unlined 80-acre area so only inert waste could be accepted at the site, or (2) if, somehow, the State Board were to conclude that Order No. 88-133 was not

in effect, the unlined 80-acre area would necessarily be governed by the old Resolution No. 60-22, as limited by Order No. 86-59, and the site would be operating under an order that predated the implementation of Chapter 15 regulations by more than 20 years. Watermaster also maintained that it was too late to "reclassify" the unlined 80-acre area, because more than five years had elapsed since the 1984 regulations went into effect, which were mandated to be fully implemented by 1989.

On July 20, 1994, the State Board's executive officer issued a memorandum to the Regional Board's executive officer concluding, based on a legal opinion from the State Board's office of chief counsel, that "[n]onhazardous solid waste may be discharged within the original 80-Acre landfill pursuant to RWQCB Resolution No. 60-22 and Order No. 86-59. [¶] . . . Since the landfill is operating pursuant to the earlier waste discharge requirements that have not been reclassified under the SWRCB's Chapter 15 regulations, the landfill operator must submit a revised report of waste discharge by October 9, 1994." The State Board reached this result by concluding that "Since RWQCB Order No. 88-133 was rescinded (except for inert disposal) the earlier RWQCB orders, which had been rescinded by Order No. 88-133, are reinstated. . . . Because the discharge of solid waste to the 80-acre site is governed by the earlier waste discharge requirements, these requirements must be reviewed by the RWQCB for compliance with the SWRCB's Chapter 15 regulations."

In October 1994 ALR submitted its revised report of waste discharge seeking classification as a Class III landfill and declaring that there was room for an additional 3,400,000 tons of municipal solid waste in the unlined 80-acre area. Watermaster immediately asked the Regional Board to hold a hearing and deny revised waste discharge requirements to ALR because the site itself plainly did not meet Chapter 15 requirements for a Class III landfill and ALR had still not even proposed an "engineered alternative" that could overcome the site deficiencies. The Regional Board did nothing substantive.

In January 1995, the EPA notified the Regional Board that the Azusa landfill was named a potentially responsible party for the Baldwin Park Superfund site, and that ALR appeared to be "one of the largest contributors of 1,4-DCB, 1,2-DCB, and CBN to the groundwater, and may be a lesser to moderate contributor of other compounds to the groundwater." In response, the Regional Board at a public meeting in April 1995 voted not to decide anything on ALR's October 1994 report of waste discharge, but instead granted ALR six months to study the site further and propose an engineered alternative that might satisfy the requirements of Chapter 15.

G. *The October 30, 1995, public meeting.*

During the six-month study period, Metropolitan retained a team of experts to investigate the site in order to augment the substantial evidence that had already led the Legislature to enact Public Resources Code section 40060, and the State Board to issue State Bar order No. 91-09, based on the overwhelming evidence that the landfill was simply in the wrong site, regardless of what mitigation measures ALR might propose.

In September 1995, ALR's consultants submitted a report that concluded that the unlined 80-acre area was in fact contaminating the Basin. ALR's consultants opined, however, that all of the degradation of the groundwater was caused by (1) gas migration, (2) silt in the soil beneath the landfill and (3) other businesses operating in the area. Concluding that it was responsible only for contamination caused by gas migration, ALR proposed to construct 20 additional gas wells.

After reviewing the data and ALR's reports, Metropolitan's experts concluded that the data was consistent only with leachate migration from the landfill—not gas migration alone—and that the leachate migration could not be corrected by installing gas wells. Metropolitan's experts calculated that ALR's proposal to add 3,200,000 tons of waste to the site would roughly double the waste in the unlined 80-acre area; the additional waste would generate an additional 5,000,000 to 6,000,000 gallons more leachate percolating into the groundwater; ALR's proposed mitigation measures of installing gas wells could not possibly prevent leachate migration and there was no viable technology that existed to do so.

Regional Board staff also analyzed the data, and met with both ALR's experts and Metropolitan's experts. On October 13, 1995, it sent its report summarizing its findings to ALR and notified other interested parties that the report was on file in staff's office and was available upon request. The report concluded that the unlined 80-acre area had degraded water quality; while gas migration in the landfill was "the most likely mechanism by which pollutants have reached and degraded groundwater[,] [i]t is still unclear whether [leachate]" also has degraded groundwater; the site itself could not ensure no future impairment of groundwater quality; the landfill did not currently have in place mitigation measures capable of preventing degradation of groundwater quality; the effectiveness of ALR's proposed additional mitigation measures have not yet been demonstrated; if the proposed mitigation measures turned out to be ineffective, "continued disposal of municipal solid waste will have added a potential source of pollution" and, in

conclusion, the "potential impacts" of additional waste disposal at the site—even *with* ALR's proposed additional mitigation measures—"range from none to *significant.*" (Italics added.)

At the regularly scheduled public meeting, the Regional Board took comments from staff, ALR and other interested members of the public including Watermaster, Metropolitan, Metropolitan's experts and others. The Regional Board then closed the public comment session, discussed the project amongst themselves and with the staff and then voted five to four to adopt Regional Board Order No. 95-151 (Order No. 95-151), which approved continued disposal of municipal solid waste and simultaneously found the project to be exempt from CEQA as an ongoing project.

On November 28, 1995, Watermaster filed a supplemental petition for review with the State Board, arguing that Order No. 95-151 violated the Porter-Cologne Water Quality Act and CEQA. Four Cities, Three Valleys, Upper District, and Metropolitan Agencies brought a separate petition for review with the State Board. On January 24, 1996, the State Board dismissed the petitions, finding that they failed to raise any "substantial issues."

On February 23, 1996, Watermaster filed its verified petition for writ of mandate, alleging violations of the Porter-Cologne Water Quality Act and CEQA. The Water Agencies also filed a petition. After full briefing, the court held a hearing and then issued its tentative statement of decision on August 12, 1996, that Order No. 95-151 had been issued in violation of CEQA. Judgment was entered on September 11, 1996, over ALR's objection.

IV

DISCUSSION

*Regional Board's Decision to Authorize the 80-Acre Unlined Area to Accept Class III Waste.*

 ALR asserts that CEQA is inapplicable because there is no "project" involved in this instance. We deal with this threshold claim first.

 CEQA defines a "project" extremely broadly as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: . . . (c) [a]n activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065; see *Bozung*

v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277, fn. 16 [118 Cal.Rptr. 249, 529 P.2d 1017] [CEQA defines " 'project' so broadly that it covers activities having no conceivable effect on the environment."]; *McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439] [" 'Project' is given a broad interpretation in order to maximize protection of the environment."]; *Bloom* v. *McGurk* (1994) 26 Cal.App.4th 1307, 1312 [31 Cal.Rptr.2d 914] ["The 'project' in this case is the ongoing operation of a . . . facility under a new regulatory scheme."].)

 ALR concedes that the Regional Board's decision to issue Order No. 95-151 involved the discretionary issuance of waste discharge requirements by a public agency, but now disputes that the dumping of waste is an activity which may cause a direct physical change in the environment. It is clear to this court that ALR's proposal to discharge *3,400,000 tons* of municipal waste in an unlined, emptied sand and gravel pit directly atop the Main San Gabriel Basin, is an activity which may cause a physical change in the environment.

Appendix G to the CEQA Guidelines[4] provides that "A project will normally have a significant effect on the environment if it will: . . . (g) Contaminate a public water supply; (h) Substantially degrade or deplete ground water resources; (i) Interfere substantially with ground water recharge; . . . (v) Create a potential public health hazard . . . ." These potential effects are, therefore, plainly the sort of "physical change[s] in the environment" that CEQA is designed to address. There cannot be a serious question that a "fair argument is extant in this instance" that the disposal of 3,400,000 tons of municipal solid waste in an unlined sand and gravel quarry atop the Basin and adjacent to the recharge areas of the Basin is an activity that "may" contaminate or degrade water quality in the Basin, or "may" interfere with ground water recharge. (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1022 [165 Cal.Rptr. 514] [applying fair argument test to issuance of a mitigated negative declaration]; *Dunn-Edwards Corp.* v. *Bay Area Air Quality Management District* (1992) 9 Cal.App.4th 644, 655 [11 Cal.Rptr.2d 850], disapproved on other grounds by *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [applying fair argument test to finding of a categorical exemption]; *Gentry* v. *City of Murietta* (1995) 36 Cal.App.4th 1359, 1406, fn. 24 [43 Cal.Rptr.2d 170] [applying fair argument test to finding of a statutory exemption].)

ALR's theory is that there will be no change in the environment because ALR has been operating as a landfill for some time. Implicitly, ALR equates *its* environment with *the* environment.

---

[4]The CEQA Guidelines appear at California Code of Regulations, title 14, section 15000 et seq.

ALR relies on two cases to support its theory. *Simons* v. *City of Los Angeles* (1976) 63 Cal.App.3d 455 [133 Cal.Rptr. 721] is inapposite. Beginning in 1935, the Los Angeles Police Department used 21 acres in Elysian Park for a police training division, pursuant to permits issued by the department of parks and recreation. In 1972, the electorate passed a charter amendment transferring the 21 acres to the department of public works. The Court of Appeal concluded that the vote to transfer the property was not a project, relying on a CEQA Guideline that specifically provides that " 'project' shall not include '. . . [t]he submittal of proposals to a vote of the people of the State or of a particular community.' " (*Simons* v. *City of Los Angeles, supra*, 63 Cal.App.3d at p. 465.)[5] That provision does not apply here.

ALR's reliance on *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847 [237 Cal.Rptr. 723] is also misplaced. *Progressive Gilroy* concerned a wastewater treatment constructed in Gilroy in the mid-1970's. Gilroy caused to be prepared an EIR that authorized a projected capacity of 6,400,000 gallons per day (mgd). (*Id.* at p. 852.) The regional water quality control board then issued waste discharge requirements authorizing a flow of 6.1 mgd. In 1984, after an unauthorized release of wastewater, the regional board reduced the permitted flow to 5.15 mgd and the facility undertook remedial action to develop percolation ponds. After the ponds were constructed, the regional board increased the authorized flow to 5.3 mgd and, in May 1984, the regional board increased the flow to the originally approved level of 6.1 mgd.

The Court of Appeal rejected the argument that a new EIR needed to be prepared when the regional board reauthorized 6.1 mgd. The court concluded that Public Resources Code section 21166 explained when, after an EIR is prepared for a project, a subsequent or supplemental EIR is required and plaintiffs had not alleged that any of those conditions existed.

Here, an EIR has *never* been prepared for the discharge of municipal solid waste at the Azusa site. This is not, therefore, a question of whether a

[5]The court also referred to former Guidelines section 15037, subdivision (c) which provided that "the term 'project' refers to the underlying activity and not to the governmental approval process." That Guideline has since been revised and now provides that "[t]he term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).) The purpose of Guidelines section 15378, subdivision (c) is to ensure that a project proponent does not file separate environmental reports for the same project to different agencies thereby preventing "consideration of the cumulative impact on the environment . . . ." (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1452 [263 Cal.Rptr. 340].)

supplemental EIR needs to be prepared because of new information, or substantial changes in the project or the circumstances under which the project is being undertaken. (Pub. Resources Code, § 21166.)

The Regional Board's decision to classify the unlined 80-acre area as an interim Class III landfill, and to authorize disposal of municipal solid waste is plainly a project for purposes of CEQA.

*The Regional Board Finding That the Project Was Exempt From CEQA as an Existing Facility.*

A. *The statutory and regulatory framework.*

The Legislature has made certain categories of projects exempt from CEQA. Many of these exemptions appear in Public Resources Code section 21080, subdivision (b). (*Sierra Club* v. *Club State Bar of Forestry* (1994) 7 Cal.4th 1215, 1230 [32 Cal.Rptr.2d 19, 876 P.2d 505] [The Legislature "has specified in section 21080 those projects that are categorically exempt from CEQA", citing Pub. Resources Code, § 21080, subds. (b)(1)-(15).].) Public Resources Code section 21080, subdivision (b)(9) exempts from CEQA "[a]ll classes of projects designated pursuant to Section 21084."

Public Resources Code section 21084 authorizes the Secretary of the Resources Agency to include in the Guidelines a list of classes of projects exempt from CEQA provided that the Secretary makes "a finding that the listed classes . . . do not have a significant effect on the environment." The classes of projects identified by the Secretary of the Resources Agency appear in Guideline section 15300 et seq. and are sometimes referred to as "categorical exemptions." The Secretary of the Resources Agency's authority to identify classes of projects exempt from CEQA is not unfettered. "The secretary is empowered to exempt only those activities which do not have a significant effect on the environment. (Pub. Resources Code, § 21084.) It follows that where there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 205-206 [132 Cal.Rptr. 377, 553 P.2d 537].) To implement the rule laid out in *Chickering*, Guidelines section 15300.2, subdivision (c) was adopted, which provides: "Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."

When a public agency receives an application for a project, it is allowed 30 days to conduct a preliminary review. (Guidelines, § 15060.) As part of

the preliminary review "[A] public agency shall determine whether a particular activity is exempt from CEQA." (Guidelines, § 15061, subd. (a).) If the agency determines that the project is exempt for any reason, it "*may* prepare a notice of exemption" which is "kept with the project application." (Guidelines, § 15061, subd. (d), italics added.) After approving a project found to be exempt, the agency or the applicant "*may* file a notice of exemption" with the Office of Planning and Research or with the county clerk. (Guidelines, § 15062, subd. (a), italics added.) If a notice of exemption is filed, the filing starts a 35-day statute of limitations "on legal challenges to the agency's decision that the project is exempt from CEQA. If a Notice Of Exemption is not filed, a 180 day statute of limitations will apply." (Guidelines, § 15062, subd. (d).)

The Regional Board determined that the project was exempt from CEQA pursuant to the exemption for an existing facility. The Regional Board did not file or prepare a notice of exemption at any time. As hereafter discussed, we find this exemption determination constituted a prejudicial abuse of discretion. Although the trial court did not decide the issue of abuse of discretion, the issue provides this court with an independent ground for affirming the judgment. The issue is one of law because it turns on the interpretation of the Guidelines. ■ An issue involving a rule of law is one which this court decides de novo.

B. *The categorical exemption for an existing facility should not be construed to include a large, municipal waste landfill.*

■ The language of the exemption for an existing "facility" is ambiguous with respect to its application to a solid waste landfill. We therefore rely on other terms and provisions of the Guidelines, the environmental hazards associated with waste disposal sites and the policy of CEQA in determining that the exemption for a "facility" should not be given an expansive construction that includes solid waste disposal sites.

1. *A categorical exemption should be construed to carry out the purposes for which such exemptions were intended.*

■ Categorical exemptions may be provided only for "classes of projects which have been determined *not* to have a significant effect on the environment." (Pub. Resources Code, § 21084, subd. (a), italics added.) These exemptions should be construed in the light of that authorization. Hence, a term that does not have a clearly established meaning, such as the exemption for existing "facilities," should not be so broadly interpreted so to include a class of businesses that will not normally satisfy the statutory

requirements for a categorical exemption, even if the premises on which such businesses are conducted might otherwise come within the vague concept of a "facility."

This principle of interpretation is embodied in the Guidelines, which state that CEQA should be interpreted to "afford the fullest possible protection to the environment within the reasonable scope of the statutory language. [Citation.]" (Guidelines, § 15003, subd. (f); see also *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278]; and *Castaic Lake Water Agency* v. *City of Santa Clarita* (1995) 41 Cal.App.4th 1257, 1268 [49 Cal.Rptr.2d 79] [rejecting "an attempt to use limited exemptions contained in CEQA as a means to subvert rules regulating the protection of the environment"].)

### 2. *The landfill is not a facility.*

The Regional Board found that the new requirements it was issuing were exempt from CEQA because the landfill was an existing facility. The categorical exemption for existing facilities is part of the Class 1 exemption, which states: "Class 1 consists of the *operation*, repair, maintenance, or *minor alteration* of existing public or private structures, *facilities*, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that previously existing . . . ." (Guidelines, § 15301, italics added.)

These terms are not defined. The concept of a facility is vague. For example, a "facility" is normally defined as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end" (Webster's New Internat. Dict. (3d ed. 1981) pp. 812-813); or "[s]omething that is built or installed to perform some particular function . . . ." (Black's Law Dict. (6th ed. 1990) p. 591.) A landfill, however, is excavated, and a "facility" is not necessarily inclusive of a landfill.

The Guidelines provide various nonexclusive examples of what is included as a facility, and ALR contends, without citation of authority, that its landfill comes within the example for public utility services. The Class 1 exemption states that it "includ[es] but [is] not limited to: . . . (b) [e]xisting facilities of both investor and publicly-owned utilities used to provide electric power, natural gas, sewerage, or *other public utility services*; . . ." (Guidelines, § 15301, italics added.) To the contrary, we find that a landfill for solid waste is not a public utility as defined by Public Utilities Code section 216. That section defines a public utility as a "common carrier, toll

bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, sewer system corporation, and heat corporation." A *solid* waste landfill is obviously not a sewage system. (Cf. Pub. Util. Code, § 11508 [defining "solid waste resource recovery"].) Nor is a solid waste landfill otherwise subject to the jurisdiction, control and/or regulation of the Public Utilities Commission. (See, e.g., Cal. Code Regs., tit. 20, art. 2.5 [Protests—Requests for Hearings]; *id.*, art. 5 [Applications for Authority to Increase Rates].)

### 3. *Continued waste disposal at the landfill does not satisfy the implied requirement that alterations be limited to "minor" alterations.*

It could be suggested that a landfill is close enough to a sewage system that it ought to be included within the vague concept of a facility, but there are good reasons—based both on other provisions of the Guidelines and the purpose of a categorical exemption—for not doing so. *First*, one of the significant features of a landfill is that its long-term operation will change the characteristics of both the landfill and the land itself, because it will be filled up with alternating layers of solid waste and dirt. Thus, the operation of a landfill inevitably involves its *alteration*. While the Guidelines provide a Class 1 exemption for *alterations* of existing facilities, the alteration must be "minor" only. (Guidelines, § 15304.) There is no way in which the dumping of 3,200,000 tons of municipal solid waste under the WDR's in this case can be considered to be a "minor" alteration in an existing facility. The Board found that ALR had determined that at the time that dumping was resumed in May 1994, the 80-acre unlined site had an additional 3,200,000 tons of capacity that would require approximately 6 years to fill.

Thus, since each of the terms in the Class 1 exemption should be construed in the light of the other terms—and of the purpose of the exemption— neither "existing facilities" nor the "operation" of such facilities should be construed to include landfills where the proposed dumping will exceed the "minor alteration" that the Guidelines permit.

Although the Guidelines do not define a minor alteration, it has to be one that is so small that it does not cross the threshold level set by the Guidelines for an exception to the categorical exemptions. Thus, a "minor" alteration cannot be an activity that creates a reasonable possibility of a significant environmental effect.

Here, however, the board found that the existing landfill was actually polluting the underground water supply, and the report submitted by Metropolitan's experts concluded dumping on the 80-acre site would generate an

additional 5,000,000 to 6,000,000 more gallons of leachate, and that ALR's proposed mitigation measures could not and would not prevent the continued pollution of the water basin. The fact that ALR disputed these conclusions is irrelevant. Under the fair argument standard of review, expert opinions supported by facts constitute substantial evidence, that, as a matter of law, precluded the Regional Board from finding that the continued dumping did not create a reasonable possibility of a significant adverse environmental effect. This kind of massive filling cannot be a minor alteration.

■ *Second*, the Guidelines' treatment of "minor alterations to land" indicates that landfilling with municipal solid waste should not in any event be treated as a minor change. Thus, while the examples of "minor . . . alteration in the condition of land . . ." for which the Guidelines provide a Class 4 exemption are not exclusive, the example that deals with the filling of "previously excavated land" does not include filling with municipal solid waste; it applies only if the filling is "with material compatible with the natural features of the site." (Guidelines, § 15304, subd. (c).)

*Third*, the legislative determination in 1989 that some of the state's existing landfills "pose a threat to groundwater, air quality and public health" (Pub. Resources Code, § 40000, subd. (b)), provides confirmation that landfills do not constitute a suitable class of properties for a categorical exemption, and the Class 1 exemption for the operation and minor alteration of existing facilities should therefore not be construed to include such landfills.

C. *The rationale for the existing facility exemption does not apply to solid waste landfills that have not been reclassified.*

The apparent rationale for the existing facilities exemption is that the environmental effects of the operation of such facilities must already have been considered. That assumption, however, cannot justify the adoption of an expansive construction for the language of the Class 1 exemption to include waste disposal landfills because the Legislature has determined that waste disposal sites operating as of November 1984 present sufficient environmental hazards as a class so that the environmental impact of every such site must be reconsidered. Consequently, the Legislature directed the State Board to reclassify all existing waste disposal sites (except for sewage treatment plants and sites used primarily for fertilizer or radioactive materials), according to the level of protection that the site affords for water quality (Wat. Code, § 13172), and the board adopted new and stricter requirements for existing landfills that accept municipal solid waste. (Cal. Code Regs., tit. 23, §§ 2510, subd. (d), 2591, subd. (c).)

Thus, even if, arguendo, the exemption for the operation and minor alterations of existing facilities could be construed to apply to waste disposal landfills, that interpretation would not satisfy the apparent rationale for the existing facility exemption unless it was limited to those landfills that have actually been reclassified pursuant to the Legislature's 1982 directive. However, in this case, because of a chain of unusual circumstances, the unlined 80-acre area had not been reclassified before it was given an existing facilities exemption.

### D. *ALR's cases are distinguishable.*

In *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd., supra,* 192 Cal.App.3d 847, 864-865, the court held that a project for the expansion of a municipal sewage waste water treatment plant was entitled to an existing facility exemption because a sewer system was one of the examples that the Guidelines provided for an existing facility, and the expansion did not exceed the capacity for which the system was originally approved. "Since the project was originally built and approved for 6.1 mgd in full compliance with CEQA, the order restoring that capacity related to an existing facility and was exempt from CEQA." (*Id.* at p. 864.) Thus, the decision implicitly supports a position that the existence—or nonexistence —of a prior environmental evaluation is a relevant factor in deciding whether the existing facility exemption should be applied.

In *Bloom* v. *McGurk, supra,* 26 Cal.App.4th 1307, 1313-1315, the court declined to follow *Committee for a Progressive Gilroy* to the extent that that case suggested that a facility does not exist for the purposes of a Class 1 exemption unless it predates CEQA or was originally implemented in compliance with CEQA. *Bloom* concluded that whether a particular facility is "existing" depends on its status at the time when the agency determines whether environmental review is warranted, and that a medical waste incinerator that had been permitted since 1982 was entitled to an existing facility exemption, even though it had apparently been established without compliance with CEQA. The court relied on the legislative policy embodied in CEQA's short statute of limitations, the fact that thousands of permits are renewed every year, and that there was no legislative or regulatory directive to reexamine each facility's prior CEQA compliance whenever a permit was renewed.

We discern that the issue presented in this case is different from *Bloom.* An implied exception is not being sought—based on the fact that this

particular site has not received an environmental evaluation—to the language of the Class 1 exemption; we perceive respondents' position to be that the language of the Guidelines provides a reasonable basis for refusing to extend the exemption for the operation and minor alteration of existing facilities to massive filling of large solid waste landfills. Considering the nature of such landfills, the policy of CEQA supports such an interpretation. In this case—unlike *Bloom*—there is a regulatory directive calling for the environmental reevaluation of all such solid waste landfills. *City of Pasadena* v. *State of California* (1993) 14 Cal.App.4th 810, 822, 824 [17 Cal.Rptr.2d 766], disapproved on other grounds by *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268], involves examples of minor alterations to existing facilities that appear to be irrelevant to the alteration issue here—whether the addition of 3,200,000 tons of solid waste constitutes a minor alteration.

The alterations in *City of Pasadena* involved the types of minor changes necessary to ensure that a building met health and safety standards, and the court found that those changes came within examples (a) and (f) of Guidelines section 15301.

In summary, the language of the Class 1 exemption for the operation and minor alteration of existing facilities, including without limitation, sewer systems, does not compel a construction to include large solid waste landfills, and we refuse to make such a construction. The operation of such landfills involves significant alterations that may threaten the environment and the intent and spirit of that exemption preclude its extension to those classes of businesses that the Legislature has determined may threaten the environment and must be reclassified. This interpretation will not create unreasonable administrative burdens. Once the environmental effects of a waste disposal landfill have been reevaluated, CEQA provides ample means for avoiding duplicative environmental evaluations in the future. (See, e.g., Guidelines, § 15006, subd. (f) [public agencies should use "a previously prepared EIR when it adequately addresses the proposed project"].)

*The Regional Board's Implied Finding That the Significant Effect Exception Did Not Preclude a Categorical Exemption.*

The Guidelines provide that categorical exemptions may not be used (i) where there is a reasonable possibility that the activity will have a significant effect on the environment (ii) due to unusual circumstance. (Guidelines, § 15300.2, subd. (c).) A significant effect is a "substantial, or potentially substantial, adverse change." (Pub. Resources Code, § 21068.)

This means that an activity has a significant effect if it "has the potential to degrade the quality of the environment." (Pub. Resources Code, § 21083.)

 We find that the Regional Board committed a prejudicial abuse of discretion in impliedly finding that the significant effect exception did not preclude a categorical exemption. First, the Regional Board's own findings, its own staff's studies, the scientific evidence presented by the respondents' experts and ALR's admission that pollutants were leaking from the landfill into the water supply incontrovertedly established that—at the time the WDR's were issued—there was a reasonable possibility that continued dumping would have a significant effect on the environment because it had the potential of degrading the underground water supply. Second, the Regional Board's finding that ALR's mitigation measures—when installed— "could" or "should" prevent further pollution are irrelevant. The board's findings ignored the governing issue—whether there was substantial evidence of a reasonable possibility that continued dumping would have a significant effect on the environment. The scientific evidence presented by respondents compelled a finding in their favor on that issue as a matter of law.

A. *The board's findings establish the first requirement of the significant effect exception as a matter of law.*

The evidence before the board did not simply show that there was a reasonable possibility that continued dumping would have a significant adverse effect on the environment; it showed that pollutants escaping from the landfill were actually polluting the underground water supply, and the board so found. Thus, the board found that its staff's study "indicated that the landfill is a contributing source of pollutants . . . that *could adversely affect*" the groundwater, that gas from the landfill has affected the groundwater 1,200 feet from the Landfill's southern boundary, and that the existing containment features "have not prevented degradation of ground water, *nor are the current features capable of doing so*." (Italics added.)

It is irrelevant that the board did not state any conclusion on whether these findings established a "reasonable possibility" that continued dumping would have a "significant effect" on the environment. The findings quoted above, plus the scientific evidence on which they were based, established a fair argument as a matter of law that there was a reasonable possibility that continued dumping would have such an effect. In addition to the affirmative findings of pollution noted above, the board found that the extent of "[p]ollutant releases from the landfill" to the groundwater have not been fully determined due to the "limited number" of sampling wells.

In short, the board concluded that the landfill was releasing pollutants, that the existing safeguards had not prevented degradation of the groundwater and were not capable of doing so in the future, that its staff's study indicated that pollutants from the landfill could adversely affect the groundwater, and that the board did not have enough data to determine the full extent of the pollutants being released by the landfill. These findings required the board—as a matter of law—to conclude that continued dumping had the potential to degrade the quality of the environment.

This principle is explained in *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 309 [248 Cal.Rptr. 352], where the county had concluded that a proposed sewer project would not have an adverse effect on the environment, despite the fact that a satisfactory sludge disposal site had not been found. ■ The court stated that an agency that has failed to conduct an adequate initial study cannot "hide behind its own failure to gather relevant data. . . . CEQA places the burden of environmental investigation on government . . . [i]f the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record. . . . [¶] . . . In the absence of any further information, the record thus permits the reasonable inference that sludge disposal presents a material environmental impact." (*Id.* at p. 311.)

■ Thus, the trial court's finding that the evidence here "clearly shows a reasonable probability" of a significant environmental effect from continued dumping was compelled. Indeed, ALR does not dispute that continued dumping—without additional mitigation—would have a significant adverse effect; its primary challenge to that finding was limited to the point that its proposed mitigation measures, when installed, would prevent further degradation of the environment.

There are at least three major flaws in that contention. First, proposed mitigation measures cannot be used to support a categorical exemption; they must be considered under the standards that apply to a mitigated negative declaration. Second, the board did not make the findings and determination that would have been required to support a conclusion that the proposed mitigation was sufficient for a mitigated negative declaration. Last but not least, the scientific evidence in the record would have precluded the adoption of a mitigated negative declaration.

B. *The board should have evaluated ALR's mitigation proposals under the substantive and procedural standard for a mitigated negative declaration.*

■ An agency should decide whether a project is eligible for a categorical exemption as part of its preliminary review of the project (Guidelines,

§§ 15060 & 15061), not in the second phase when mitigation measures are evaluated. In determining whether the significant effect exception to a categorical exemption exists, "[i]t is the *possibility* of a significant effect . . . which is at issue, not a determination of the actual effect, which would be the subject of a negative declaration or an EIR. Appellants cannot escape the law by taking a minor step in mitigation and then find themselves exempt from the exception to the exemption." (*Lewis* v. *Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 830 [211 Cal.Rptr. 884], original italics; see also *City of Pasadena* v. *State of California*, *supra*, 14 Cal.App.4th 810, 820 [The determination of "the applicability of an exemption must be made *before* . . . [the] formal environmental evaluation . . . ."].)

The reason is not simply because that is what the Guidelines require; the fundamental reason is substantive. The Guidelines dealing with the second phase of the environmental review process contain elaborate standards—as well as significant procedural requirements—for determining whether proposed mitigation will adequately protect the environment and hence make an EIR unnecessary; in sharp contrast, the Guidelines governing preliminary review do not contain any requirements that expressly deal with the evaluation of mitigation measures.

Thus, the standards for evaluating proposed mitigation measures are covered by the Guideline regarding a mitigated negative declaration. The Guidelines on this issue start with the standards for a tentative decision that proposed mitigation measures will protect the environment. They state that a proposed negative declaration must be prepared, inter alia, when potentially significant environmental effects have been identified, but "(1) [mitigation measures] . . . would . . . mitigate the effects to a point where clearly no significant effects would occur, and [¶] (2) [t]here is no substantial evidence before the agency that the project as revised may have a significant effect on the environment." (Guidelines, § 15070, subd. (b)(1) and (2).)

The proposed negative declaration must then be circulated for public review, and must include, inter alia, "[a] proposed finding that the project will not have a significant effect on the environment . . . ." (Guidelines, § 15071, subd. (c).) After public review, the agency shall approve the negative declaration if it finds: "[T]hat there is no substantial evidence that the project will have a significant effect on the environment." (Guidelines, § 15074, subd. (b).) These provisions obviously require the agency to apply the fair argument standard in evaluating the evidence; Guidelines section 15074 cites the code section that permits a negative declaration where there is no substantial evidence in the light of the whole record "that the project,

as revised, may have a significant effect on the environment." (Pub. Resources Code, § 21080, subd. (c)(2).) We discuss the Legislature's reconsideration of this section hereafter.

Finally, if the agency approves the project on the basis of a negative declaration it must file a notice stating its determination that, inter alia, "the project will not have a significant effect on the environment." (Guidelines, § 15075, subd. (b)(4).)

These provisions are reinforced by the Guideline standards for determining whether a project "may" have a significant effect. These standards provide that if the agency finds that there is "no substantial evidence" that the project may have a significant effect, it must prepare a negative declaration (Guidelines, § 15064, subd. (g)(2)), whereas if there is a fair argument that the project may have a significant effect even though there is also substantial evidence that it will not have a significant effect, the agency *shall* prepare an EIR. (Guidelines, § 15064, subd. (g)(1).) Further, "If there is a disagreement between experts over the significance of an effect . . . the lead agency shall treat the effect as significant . . . ." (Guidelines, § 15064, subd. (h)(2).)

It is obvious to this court that an agency should not be permitted to evade these standards by evaluating proposed mitigation measures in connection with the significant effect exception to a categorical exemption. If it nevertheless does so, it should at least apply the same standards and procedures in making that evaluation that it would have used if it had followed the Guidelines and evaluated the mitigation proposals in deciding whether the project was eligible for a mitigated negative declaration.

 The Regional Board's failure to follow the substantive requirements for a mitigated negative declaration in this case produced the same type of error that was condemned in *Sundstrom* v. *County of Mendocino, supra,* 202 Cal.App.3d 296, 305-308. The agency in that case evaded the substantive requirements for a mitigated negative declaration by postponing a full evaluation of some environmental effects until after the negative declaration had been issued. The court stated that this practice was "contrary to law" because, inter alia, there was no guarantee of an adequate environmental analysis and inquiry. (*Id.* at p. 307.) The Regional Board in this case accomplished the same result by making its environmental evaluation even before it reached the negative declaration stage of the environmental review process, thereby conducting an "end run" around the governing standards.

C. *A significant effect determination must be made and reviewed under the fair argument standard.*

▆▆▆ ALR's contention that the standard of review is whether substantial evidence supports the board's decision evades the issue. The decisive question is whether there is substantial evidence to support the conclusion that the board would have had to reach in order to determine that the proposed mitigation measures would eliminate the significant effect on the environment caused by dumping. That conclusion, as previously discussed, would have required a determination, on the basis of the whole record, that there was *no* substantial evidence that there would be a significant effect. Since that is the type of evaluation that is required by the fair argument standard, the substantive requirements of the Guidelines necessarily required the Regional Board to apply that standard. This court must likewise use that standard in determining whether the Board's decision is supported by substantial evidence. (See *Castaic Lake Water Agency* v. *City of Santa Clarita, supra,* 41 Cal.App.4th 1257, 1264-1265 [the Guidelines define substantial evidence in terms of the "fair argument" test]; and *Citizens' Com. to Save Our Village* v. *City of Claremont* (1995) 37 Cal.App.4th 1157, 1168-1169 [44 Cal.Rptr.2d 288] [describing the fair argument standard]; see also *Dunn-Edwards Corp.* v. *Bay Area Air Quality Management Dist., supra,* 9 Cal.App.4th 644, 656 [the fair argument standard applies to the determination of the environmental effects prong of the significant effect exception to categorical exemptions]; cf. *City of Pasadena* v. *State of California, supra,* 14 Cal.App.4th 810, 824 [the evidence that Pasadena relied on—largely rumor and hearsay—did not constitute substantial evidence that there was a reasonable possibility of a significant environmental effect].) Insofar as CEQA is concerned, the trial and appellate courts apply the same standard of review. (See *Dunn-Edwards Corp.* v. *Bay Area Air Quality Management Dist., supra,* 9 Cal.App.4th at p. 655 ["the trial court, as well as this court, reviews the record pursuant to the *Friends of 'B' Street* [that is, the fair argument] standard"]; *Gentry* v. *City of Murrieta, supra,* 36 Cal.App.4th 1359, 1375-1376.)

Respondents do not contend on appeal that the Water Code's standard of review is relevant to the CEQA determinations.

The trial court did not state which standard of review it was applying in making its principal CEQA findings, although those findings were not made pursuant to the independent judgment standard of the Water Code, since the court used that standard in readopting those same findings in paragraph 2 of its statement of decision.

The fair argument standard was confirmed by the 1993 amendments to Public Resources Code sections 21080 and 21082. The proposed amendments initially included a significant restriction on the fair argument rule. (See Separate Amend. to Sen. Bill No. 919 (1993-1994 Reg. Sess.) Apr. 28, 1993.)[6] That bill contained proposed findings that the fair argument standard was contrary to the legislative intent and that judicial review shall be based on the substantial evidence standard; and it proposed an amendment that was apparently intended to carry out that finding. (*Id.* at §§ 1, subds. (h) & (i); 8, amending Pub. Resources Code, § 21082.2, subd. (b).) By the time the bill reached the Assembly, there was intense opposition.[7]

The Assembly amended the bill, inter alia, to delete the findings attacking the fair argument standard, to add proposed subdivisions (d), (e), and (f) to Public Resources Code section 21080, to delete the proposed addition to section 21082.2, subdivision (b) that restricted the fair argument standard, and to add a new subdivision (c) to that section that required the preparation of an environmental impact report for nonexempt projects where there is substantial evidence in the light of the whole record that a project may have a significant effect on the environment. (See Assem. Amend. to Sen. Bill No. 919, *supra*, Aug. 16, 1993.) These changes were included in the bill as passed.

Thus, the challenges to the fair argument standard that were initially made in the Senate were ultimately rejected, and the amendments that the Legislature made to Public Resources Code section 21080 effectively require the application of that standard. (See Pub. Resources Code, § 21080, subds. (c) & (d); see also subd. (e) [defining substantial evidence as including expert opinion supported by facts]; cf. *Central Delta Water Agency* v. *State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 632 [21 Cal.Rptr.2d 453] [The Legislature's rejection " 'of a specific provision . . . in an act as originally introduced is "most persuasive" that the act should not be interpreted to include what was left out. . . .' [Citations.]"].)

Hence, the question whether continued dumping would have a significant effect on the environment, despite the proposed mitigation measures, should have been considered under the fair argument standard, and that required the board to determine whether its staff, and the landfill's opponents had

---

[6]Respondents filed a motion asking this court to take judicial notice of the legislative history of this bill, as provided by a report of the Legislative Intent Service that is attached as exhibit 1 to the motion. The motion was heard and granted at the hearing on oral argument.

[7]See the analysis of the Assembly Committee on Natural Resources entitled "Should the Fair Argument Test Be Repealed and Other Changes Made to the California Environment Quality Act?" (Analysis of Sen. Bill No. 919 (1993-1994 Reg. Sess.) as amended Apr. 28, 1993.)

presented substantial evidence that continued dumping had the potential to degrade the environment even if the proposed mitigation measures were installed. We perceive that the board, however, ignored that issue.

D. *The board's conclusions did not satisfy the substantive requirements for a mitigated negative declaration.*

As discussed above, an agency cannot approve a mitigated negative declaration unless it finds that there is no substantial evidence that the project will have a significant effect. (Guidelines, § 15074, subd. (b).) The Regional Board did not, however, even attempt to satisfy that standard, and made no findings on whether there was substantial evidence that the project would have a significant effect despite the proposed mitigation. Instead, it attempted to predict the actual effect of the mitigation measures, but it did not make the required determination that the project "will not have a significant effect on the environment." (Guidelines, § 15075, subd. (b)(4).)

The board found only that:

"It is reasonable to conclude" that the proposed mitigation measures "*could* result in control of deep gas migration, and possible liquid leakage . . . by December 31, 1997." (Italics added.)

The proposed mitigation measures "have not yet demonstrated equivalency to the performance goal for Class III landfills."

"Substantial data . . . supports the conclusion" that the proposed mitigation measures "*would likely* achieve compliance" with the governing water quality standards. (Italics added.)

Continued dumping will increase the waste in the unlined 80-acre area by approximately 20 percent and "will generate landfill gases and leachate," but "this *should* be effectively controlled" by the proposed mitigation measures. (Italics added.)

Thus, instead of making the required findings and conclusions that there was no substantial evidence that continued dumping would have a significant effect, and that the project "will not have a significant effect on the environment," the board equivocated, using such inconclusive terms as "could result," "would likely," and "should be controlled."

As discussed hereafter, there was substantial scientific evidence to support a finding that continued dumping would create a reasonable possibility of a significant effect on the environment, even after the proposed mitigation

measures were installed. The evidence therefore showed, as a matter of law, that the first requirement for the substantial effects exception to a categorical exemption was established.

E. *There was substantial scientific evidence that continued dumping would have a significant effect on the environment.*

The administrative record contains three studies prepared by scientists that deal with the effects of continued dumping. ALR's consultants concluded that in their opinion all of the existing degradation of the groundwater caused by the landfill was due to gas migration, since the landfill was too dry to produce leachate; that the contamination of the groundwater could also be explained by silt in the soil beneath the landfill and by contamination produced by others; and that the additional wells that ALR was proposing would be sufficient to prevent any continuing contamination of the groundwater by the landfill. Under ALR's proposal, there would be a total of 181 gas extractions wells in the landfill, 41 of which would also have liquid removal pumps.

Metropolitan's team of experts reviewed the same data and rejected ALR's conclusions. They concluded that leachate was also contributing to the Basin pollution, that the additional MSW would cause a substantial increase in the amount of pollution, and that ALR's proposed engineered alternative would not be able to control the additional pollution. They concluded, inter alia, that (1) the unlined 80-acre area is leaking leachate, not simply landfill gas (groundwater contamination cannot be explained by gas migration); (2) the landfill is wet enough to generate leachate; (3) the proposed additional MSW will generate an additional 5,000,000 to 6,000,000 gallons more leachate than if the unlined 80-acre area were closed and capped at this time ("The magnitude of leachate production during this additional six years will be substantial."); (4) the additional waste will approximately double the existing waste; (5) the additional waste will increase the estimated period of leaching from 500 years to 800 years; (6) ALR's explanations for the contamination of the Basin are invalid; and (7) ALR's proposed engineering alternatives will not prevent continued contamination of the Basin since ALR proposed to increase the rate of liquid removal to 28,000 gallons per month but the current leachate leakage rates to the groundwater are estimated to be approximately 80,000 gallons per month, and there is no viable technology to extract such a large quantity of leachate in order to prevent migration into the groundwater of the Basin.

In sum, conclusions of these experts provided substantial evidence that showed a reasonable probability that continued deposits of MSW at the Azusa landfill would have a significant effect on the environment.

The Regional Board staff also submitted a report that concluded, inter alia, that (1) landfill gas is the most likely cause of pollution release from the landfill; (2) it is "still unclear as to whether [leachate]" has also degraded the groundwater, but that "the *extremely high* TDS, chloride, hardness, and electric conductivity values detected at Azusa Landfill . . . implies ground water pollution from landfill liquids" (italics added), and that "elevated inorganic concentrations found in downgradient monitoring wells have not been fully explained"; (3) the effectiveness of ALR's proposed additional mitigation measures has not yet been demonstrated; (4) if the proposed mitigation measures turn out to be ineffective, "continued disposal of municipal solid waste will have added a potential source of pollution" and (5) the "potential impacts" of additional waste disposal at the site—even with ALR's proposed additional mitigation measures—therefore "range from none to *significant*."

In sum, there was substantial evidence in the record that continued dumping would have a serious, adverse effect on the water supply, and there was no permissible basis shown by the record for the board to reject that evidence under the fair argument standard. Indeed, its own staff concluded that the possibility of a significant adverse effect could not be ruled out. Thus, the first requirement for the significant effect exception to the existing facilities exemption was established as a matter of law.

F. *The second requirement for the significant effect exception was also established.*

As previously discussed, the Guidelines provide an exception to the categorical exemption where there is a reasonable possibility that the activity will have a significant environmental effect "due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) The Guidelines do not define "unusual circumstances." That requirement was presumably adopted to enable agencies to determine which specific activities—within a class of activities that does not normally threaten the environment—should be given further environmental evaluation and hence excepted from the exemption. The unusual circumstances concept was apparently mentioned for the first time in this general context in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 272 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on other grounds by *Kowis* v. *Howard* (1992) 3 Cal.4th 888 [12 Cal.Rptr.2d 728, 838 P.2d 250], where the court stated: "[C]ommon sense tells us that the majority of private projects for which a government permit . . . is necessary are minor in scope—e.g., relating only to . . . an individual dwelling or small business—and hence, in the absence of unusual circumstances, have little or

no effect on the public environment." *Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413 [129 Cal.Rptr. 902] provides a good example of the unusual circumstances concept: That test is satisfied where the circumstances of a particular project (i) differ from the general circumstances of the projects covered by a particular categorical exemption, and (ii) those circumstances create an environmental risk that does not exist for the general class of exempt projects.

*Myers* involved a proposed minor land division for which a Class 4 exemption was sought, and the court concluded that there were sufficient unusual circumstances—in comparison with Class 4 projects that would not normally harm the environment—to establish the exception. These included the fact that the project would require an extensive road scar near a scenic highway, and steep hillside grading where there was a risk of erosion; that the location of the septic tank leach lines created a danger of sewage seepage into a creek and a drinking water well; that there was a significant fire danger because of the project's location on a thickly forested slope; and that several scenic oaks would have to be removed. (*Myers* v. *Board of Supervisors*, *supra*, 58 Cal.App.3d at p. 426.)

Similarly, in this case, the threat to the environment posed by the unlined 80-acre area is due to numerous circumstances that are unusual in comparison with existing facilities in general. ALR's argument on this issue fails to draw a distinction between factual and legal issues. Thus, the question whether a particular circumstance exists would normally be a factual issue, whereas the question whether that circumstance is "unusual" within the meaning of the significant effect exception would normally be an issue of law that this court would review de novo. Thus, ALR's contention that the Regional Board did not "have" to make a particular finding is beside the point; if the record established a particular circumstance, it does not matter whether the Regional Board—or even the trial court—found that the circumstance was "unusual" within the meaning of the Guidelines. This court will decide that issue for itself.

All of the following circumstances are undisputed, and are clearly "unusual" in relation to existing facilities in general:

The landfill differs from existing facilities in general in that it is used for a type of activity—large scale landfilling with municipal waste—that would not be entitled to a Class 4 exemption, or any other exemption for such an activity.

Waste disposal landfills differ from other types of existing facilities in that the Legislature has determined that such landfills do pose a threat to the environment, and must be reevaluated and reclassified.

This landfill differs from existing waste disposal landfills in general in that the board found that "Azusa Landfill overlies a major drinking water aquifer in highly permeable sands and gravel that provide a direct pathway for landfill pollutants to move to ground water. This is clearly in conflict with Section 2533(b)(1) [of Chapter 15]."[8]

This landfill differs from existing facilities in general in that it does not possess the safeguards needed to protect the environment from the types of pollutants that landfills are likely to produce. As noted, the board found that: "Containment features currently in place at Azusa Landfill (primarily gas extraction) have not prevented degradation of ground water, *nor are the current features capable of doing so.*" (Italics added.)

There has been an increasing awareness of the environmental hazards posed by landfills, and the hazards posed by this landfill in particular.

Compare *Meridian Ocean Systems, Inc.* v. *State Lands Com.* (1990) 222 Cal.App.3d 153, 164-165 [271 Cal.Rptr. 445] (holding that the development of new scientific evidence with respect to a particular activity that was not available when the categorical exemption was adopted constitutes an unusual circumstance). The circumstances in this case are analogous, from the standpoint of the protection of the environment, because there has been an increasing awareness—since the adoption of the existing facility exemption—of the environmental hazards created by solid waste landfills. The Legislature has not only determined that some solid waste landfills pose a threat to groundwater (Pub. Resources Code, § 40000, subd. (b)), but it has determined that notwithstanding any other provision of law, no new solid waste disposal site shall be established in a sand and gravel pit, and/or in any site within the Basin. (Pub. Resources Code, § 40060, subds. (a) & (f).) Further, in early 1995, the EPA notified ALR that it was a potentially responsible party for part of the San Gabriel Valley Superfund Cleanup, based on various chemical compounds found in monitoring wells for the 80-acre unlined landfill, and the record reflects that ALR has now acknowledged that the landfill is polluting the underground water supply.

In sum, there are a host of circumstances that are unusual as a matter of law when compared with the circumstances surrounding the typical existing

---

[8]The trial court's finding that this site is adjacent to an expansion area that the State Board has determined would be inappropriate for a landfill implies that the 80-acre site would also be inappropriate. This court, of course, does not need to rely on an inference for that point; the Regional Board's findings concerning the nature of the site demonstrate that it is inappropriate for a landfill. ALR's contention that the environmental concerns could be mitigated is irrelevant to the unusual circumstances issue.

facility, and which compel this court to conclude that the threat to the environment from this landfill—in comparison with existing facilities in general—is due to unusual circumstances.

G. *The Water Agencies exhausted available administrative remedies before filing a petition for writ of mandate.*

After the Regional Board found that the project was exempt from CEQA, the Water Agencies timely filed a petition with the State Board arguing, inter alia, that (1) the exemption relied upon by the Regional Board was inapplicable and (2) even if the existing facilities exemption applied, there was an applicable exception because there was a reasonable probability that ALR's acceptance of municipal solid waste as a Class III landfill could have a significant impact due to unusual circumstances. The State Board declined to hear the petitions, stating that the petitions failed to raise any substantial issues appropriate for review.

Watermaster then timely filed a petition for writ of mandate in the superior court that raised the agency's failure to comply with CEQA before issuing waste discharge requirements to ALR, and alleged exhaustion of administrative remedies. In its answer, the State Board *admitted* that Watermaster had exhausted its administrative remedies before seeking judicial review. Likewise, in its opposition brief to the Water Agencies' writ petition, the State Board did not claim that they had failed to exhaust their administrative remedies, although ALR did raise the issue. We find that the trial court properly rejected ALR's argument.

1. *CEQA and the Guidelines do not provide for any administrative remedy to challenge an exemption finding.*

The types of proceedings that create an exhaustion requirement with respect to CEQA are stated in Public Resources Code section 21177, which provides, in pertinent part: "(a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person *during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.*" Prior to 1993, this section did not state when an objection must be made to a proposed administration plan. The italicized language was added when the section was amended in 1993. (See Assem. Amend. to Sen. Bill No. 919 (1993-1994 Reg. Sess.) Sept. 9, 1993.) These changes were embodied in the section as enacted. (Stats. 1993, ch. 1131, § 10.)

Thus, the exhaustion requirement applies where (1) CEQA provides a public comment period, or (2) there is a public hearing before a notice of determination is issued. In this case, however, because the Regional Board declared that the project was exempt from CEQA, there was *no* "public comment period provided by [CEQA]" and there was *no* "public hearing . . . before the issuance of the notice of determination." Consequently, Public Resources Code section 21177 has no application in this instance.

CEQA provides for public comment on a negative declaration and an EIR. (Pub. Resources Code, § 21092.) By contrast, CEQA does not provide for a public comment period before an agency decides a project is exempt.

Similarly, where an agency approves a project and simultaneously decides that the project is exempt from CEQA, there is no "public hearing . . . before the issuance of the notice of determination." A notice of determination is a document that must be filed only *after* a public agency certifies an EIR, and approves a project. (Pub. Resources Code, §§ 21108, subd. (a), 21152, subd. (a); Guidelines, § 15094.) Before that notice of determination is issued, interested parties are given ample opportunity to comment on the EIR. CEQA provides for a public comment period of 30 to 90 days on a draft EIR. (Pub. Resources Code, § 21091, subd. (a); Guidelines, § 15087, subd. (c).) If a draft EIR is recirculated, the public has another 30 to 90 days to comment on the recirculated EIR. (Pub. Resources Code, § 21092.1; Guidelines, § 15088.5.) The agency then has to evaluate and respond to the comments received. (Guidelines, § 15088.) After the EIR is complete and before approving the project, the agency may, but is not required to, hold a public hearing. Public Resources Code section 21177, subdivision (a) may require that a litigant raise issues about an EIR during the proceedings leading up to the certification of an EIR and approval of a project, but we are unable to discern a requirement in the section that a person contest an exemption determination before challenging it in court.

The *only* prerequisite to an action challenging an exemption determination is that it be brought within 180 days of the date of the final decision of the agency. (Guidelines, § 15062, subd. (d).)

 ALR claims that, by failing to object prior to the close of the October 30, 1995, public meeting, the Water Agencies failed to comply with the requirement that objections must be noted "prior to the close of [the] public hearing on the project . . . ." ALR's argument, however, ignores the rest of section 21177, subdivision (a), which provides: "the close of the public hearing . . . *before the issuance of the notice of determination.*" (Italics added.)

Moreover, there was no public *hearing* on October 30, 1995, there was simply a regularly scheduled public meeting of the Regional Board. (Compare Cal. Code Regs., tit. 23, § 647 [describing procedures for a public hearing] with the transcript of the Oct. 30, 1995, public meeting.)

The case law is in accord. In *City of Pasadena* v. *State of California, supra,* 14 Cal.App.4th 810, the State of California sought a site to relocate a parole office. Pasadena objected in meetings with representatives of the Governor and other officials. The state filed a notice of exemption on September 14, 1990, and leased a site in Pasadena in October 1990. On October 17, 1990, Pasadena filed suit and later amended its complaint to allege noncompliance with CEQA. The state argued that Pasadena had never raised CEQA and therefore failed to exhaust administrative remedies. This court rejected the argument because: "Pasadena filed its petition for writ of mandate within 35 days from the filing of the notice of exemption . . . . [¶] . . . It would be paradoxical to construe CEQA to require Pasadena to present a complete explication of its objections to the claimed exemption before the State filed its determination that the project is exempt." (*Id.* at p. 821.)

Similarly, in *Castaic Lake Water Agency* v. *City of Santa Clarita, supra,* 41 Cal.App.4th 1257, this court reversed the trial court's ruling that Castaic Lake had failed to exhaust its administrative remedies because it failed to dispute at a public hearing a determination that a project was exempt from CEQA. "The Guidelines provide that the filing of a notice of exemption and the posting on the list of notices start a 35-day statute of limitations period on legal challenges to the agency's decision that the project is exempt from CEQA. Castaic filed its petition for writ of mandate within that statutory period satisfying the requirements of the guidelines. Nowhere in these guidelines are there administrative procedures that must first be followed before a petition for writ of mandate may be filed." (*Id.* at pp. 1265-1266.)

 2. *By petitioning the State Board, the Water Agencies exhausted the administrative remedy provided by the Water Code.*

Even if respondents had to challenge the exemption finding administratively, they clearly did so here. ▮▮▮ Whether a party has exhausted its administrative remedies "in a given case will depend upon the procedures applicable to the public agency in question." (*City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 969 [3 Cal.Rptr.2d 643].) ▮▮▮ The Water Code provides an administrative remedy to a party that contends that a Regional Board has issued water discharge

requirements in error—that party may petition the State Board to review the regional board's action. (Wat. Code, § 13320, subd. (a); cf. *Hampson* v. *Superior Court* (1977) 67 Cal.App.3d 472 [136 Cal.Rptr. 722] [petitioner failed to exhaust administrative remedies because he did not seek State Board review of regional water board's decision].) The respondents pursued this administrative remedy to give the State Board "an opportunity to act and render the litigation unnecessary" (*Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794]), but the State Board declined to act. No more was required.

> 3. *ALR is collaterally estopped from relitigating the issue of exhaustion of administrative remedies.*

The Court of Appeal has already considered the issues of exhaustion involving the same parties, the same agencies and the same landfill site. (See *Upper San Gabriel Valley Mun. Water Dist.* v. *State Water Resources Control Bd.* (Jan. 14, 1991) B050366 [nonpub. opn.] (*Upper District*).)[9] In issuing Order No. 88-133, the Regional Board found that the project was exempt from CEQA as an ongoing project. No one raised CEQA in the proceedings before the Regional Board that preceded Order No. 88-133. Watermaster and others petitioned the State Board for review, but no petition raised CEQA. The State Board accepted review, and during the State Board proceedings, two interested parties commented to the State Board that the project was not exempt from CEQA.

The trial court ruled that petitioners had failed to exhaust administrative remedies. On appeal, ALR argued that the Water Agencies had failed to exhaust administrative remedies because they did not first raise a CEQA challenge with the State Board. The State Board argued that petitioners had not exhausted administrative remedies because they failed to raise CEQA before the Regional Board as required by Public Resources Code section 21177. The Court of Appeal reversed, finding that administrative remedies had been exhausted.

ALR is now collaterally estopped from relitigating the issue resolved by the Court of Appeal in the *Upper District* case, namely, that a party exhausts his or her administrative remedies if he or she challenges, by petition to the State Board, a regional water board order finding a project exempt from CEQA. ██ "Collateral estoppel forecloses relitigation of an issue that (1) is identical to one decided in a prior case (2) involving the same party or parties . . . and (3) which resulted in a final judgment on the merits."

---

[9]This opinion is cited pursuant to California Rules of Court, rule 977(b)(1).

(*County of Los Angeles* v. *County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102, 108 [16 Cal.Rptr.2d 479].) The issue raised in 1991 before this court was identical to the issue that ALR raises here—are administrative remedies for an exemption determination exhausted if a CEQA objection is raised for the first time before the State Board? By finding that petitioners had exhausted their administrative remedies, the court in the *Upper District* case necessarily concluded that Public Resources Code section 21177 did not require CEQA to be raised before the Regional Board so long as it was raised before the State Board.[10]

 4. *It is irrelevant whether the State Board "dismissed" or "denied" the petitions.*

 ALR contends that the Water Agencies failed to exhaust their administrative remedies because the State Board decided to dismiss the Water Agencies' petitions to review Order No. 95-151 rather than to deny the petitions. ALR does not explain how this distinction makes a difference and refers to no authority to support its claim.

 First, a regional board order is not final until the State Board dismisses a petition for review. (*People* ex rel. *Cal. Regional Wat. Quality Control Bd.* v. *Barry* (1987) 194 Cal.App.3d 158, 177 [239 Cal.Rptr. 349] ["when the state board denied Barry's petition for review [for failure 'to raise substantial issues . . . appropriate for review'], the regional board's orders were final"].)[11] Indeed, a party may not seek superior court review until the State Board either denies or dismisses a petition challenging a regional board order. (*Id.* at p. 175.) Thus, it is irrelevant whether the State Board declined review of the Water Agencies' petitions, or denied the petitions—the Water Agencies raised CEQA before a final administrative decision.

 Second, it is immaterial whether the State Board *dismisses* a petition for "failure to raise substantial issues appropriate for review," or *denies* the petition. Under the State Board regulations, even when the Board accepts review of a regional order, it is not required to ask for or accept briefs from the parties, take testimony or evidence, or hold a hearing. The State Board must only review the regional board's records and a transcript

---

[10]The amendments to section 21177 made in 1993 do not affect this issue, because the amendments provide for time periods for making an objection that are inapplicable to an exemption determination.

[11]We note that notwithstanding the language in the quoted portion of the opinion about "denying" Barry's petition, *Barry* concerned the State Board's authority not to review a petition for review of a regional water board decision. (194 Cal.App.3d at p. 168.)

of any hearing. "If formal disposition of the petition is not made . . . within 270 days" of the date the petition is complete it is "deemed denied." (Cal. Code Regs., tit. 23, § 2052, subd. (d).) Thus, a dismissal is equivalent to a denial.

Third, we are of the opinion that the Water Agencies did their part by asking the State Board to review the finding that the project was exempt from CEQA. The State Board was therefore given an opportunity to "render litigation unnecessary." This court does not believe that the question whether a person exhausted available administrative remedies should turn on how the agency decided to deal with an objection *after* it is properly raised.

 5. *A CEQA challenge must only be raised before the final administrative arbiter.*

 In *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738 [202 Cal.Rptr. 423], appellants claimed that Audubon had failed to exhaust its administrative remedies because it failed to participate in public hearings before the county's environmental review board, which determined that an EIR was adequate. (*Id.* at p. 745.) Although the county development code allowed for appeals from the environmental review board to the county board of supervisors, Audubon did not appeal. An Audubon representative did, however, appear before the planning commission and the board of supervisors. The court found that Audubon had exhausted its administrative remedies. "[The doctrine of exhaustion of administrative remedies] requires that the parties await the *final* outcome of administrative proceedings before seeking judicial review. [Citation.] In this case, for example, had Audubon appeared before the [environmental review board] and the planning commission but failed to appear before the Board, it would have failed to exhaust its administrative remedies. The doctrine contemplates that the designated final administrative arbiter is deprived of review, not that an intermediate procedure is circumvented. Here, the Board, the agency with the ultimate responsibility to approve or disapprove the project, considered and determined the adequacy of the EIR as well as the total site application. Therefore, the purpose of the rule of exhaustion of administrative remedies was fully served by [their] appearance before the Board." (*Id.* at p. 748.)

In *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852 [226 Cal.Rptr. 575], Browning-Ferris Industries (BFI) opposed the approval of a landfill operated by its main competitor. A draft EIR was prepared and circulated to various state and local agencies and to the public. After a public

hearing, the planning commission found the EIR to be complete. At a later public hearing, the planning commission recommended to the city that zoning be changed to allow the landfill. BFI did not comment on the EIR orally or in writing before the planning commission, but did, after the fact, write a letter to the city asserting that the EIR was inadequate. The court concluded that ". . . BFI pursued its remedies before the agency with the ultimate responsibility for giving final approval of the EIR." (*Id.* at p. 860.)

ALR tries to distinguish the situation here because, it claims, the "State Board had no obligation to directly approve" Order No. 95-151, and the "Sate [*sic*] Board made no decision on the merits of these issues." The Court of Appeal rejected this same argument in *Upper District.* ALR does not explain what it means by "directly approve" and refers to no case that uses such language. The State Board is "the final administrative arbiter" and a regional board decision is not final unless no petition for review is filed or the State Board adopts the order by declining to review it. Moreover, the State Board did decide on the merits that the Water Agencies' petitions "failed to raise substantial issues."

6. *The State Board can and has waived the exhaustion requirement.*

The doctrine of administrative exhaustion was developed through the case law. In enacting Public Resources Code section 21177, the Legislature said that "It is the intent of the Legislature in adding Section 21177 . . . to codify the exhaustion of administrative remedies doctrine. It is not the intent to limit or modify any exception to the doctrine of administrative remedies contained in case law." (Stats. 1984, ch. 1514, § 14.5, p. 5345.) The rationale behind the doctrine of exhaustion of administrative remedies is to serve the interests of the administrative agency and to prevent unnecessary litigation. " 'The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review.' " (*Ultramar, Inc.* v. *South Coast Air Quality Management Dist.* (1993) 17 Cal.App.4th 689, 700-701 [21 Cal.Rptr.2d 608], quoting *Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855].) By presenting the issue to the administrative body, the agency "will have had an opportunity to act and render the litigation unnecessary." (*Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794].)

ALR repeatedly asserts that exhaustion is " 'jurisdictional" but misapprehends the case upon which it relies. As explained in *Green* v. *City of*

*Oceanside* (1987) 194 Cal.App.3d 212 [239 Cal.Rptr. 470], the failure to exhaust does not deprive a court of subject matter jurisdiction. The cases that describe the requirement as "jurisdictional" simply stand for the unremarkable proposition that the court does not have the discretion to refuse to apply the doctrine in cases where it applies. (*Id.* at p. 222 [exhaustion doctrine is " 'jurisdictional' only in the sense that a court's failure to apply the rule in a situation *where the issue has been properly raised* can be corrected by the issuance of a writ of prohibition." (Italics added.)].) An agency therefore may waive the defense. (*Id.* at pp. 223-224.)

 Here, the State Board—the party which the exhaustion doctrine is intended to protect—has conceded that the Water Agencies exhausted administrative remedies. The agency's admission that the available administrative remedies were exhausted should therefore be dispositive. (See *ASARCO Inc.* v. *Environmental Protection Agcy* (D.C. Cir. 1978) 578 F.2d 319 [188 App.D.C. 77] [no failure to exhaust where project developer, but not agency, alleged such failure]; *id.* at pp. 320-321, fn. 1.)

*No Statutory Exemptions Apply.*

A. *Public Resources Code section 21169 is inapplicable.*

 ALR contends that its project is exempted from CEQA by Public Resources Code section 21169 and therefore not subject to the significant effect exemption for a categorical exemption. The contention lacks merit. When CEQA was implemented in 1970 (Stats. 1970, ch. 1433, § 1, p. 2780 et seq.) it was unclear whether it applied to projects carried out by private entities that required a governmental approval, or rather, only to projects carried out by a public agency directly. In *Friends of Mammoth* v. *Board of Supervisors*, *supra*, 8 Cal.3d 247, the Supreme Court held that CEQA applied to private, as well as public projects. The petition for rehearing argued that the decision should be prospective only, to avoid hardship to people who had relied on permits issued since CEQA became effective. Observing that the statute of limitations in CEQA claims was quite short, the court saw "no need for such a drastic step." (*Ibid.*)

The Legislature disagreed, and promptly enacted Public Resources Code sections 21169, 21170 and 21171 as urgency measures. Public Resources Code section 21169 provides: "Any [private] project . . . undertaken, carried out or approved on or before [December 5, 1972] and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before [December 5, 1972] notwithstanding a failure to comply with this division, if otherwise legal and valid,

is hereby confirmed, validated and declared legally effective. . . ." The purpose of the legislation was "to ameliorate the hardship created by the *Friends of Mammoth* decision . . . . Its general effect was to limit the retroactive application of CEQA in certain compelling situations." (*Cooper v. County of Los Angeles* (1977) 69 Cal.App.3d 529, 533 [138 Cal.Rptr. 229]; see also Guidelines, § 15261.)

ALR argues it falls within the protection afforded by Public Resources Code section 21169 because the "landfill was approved in 1960, prior to the key date under the exemption: April 5, 1973." ALR's reference to April 5, 1973, is presumably based on Public Resources Code section 21171, which created a 120-day moratorium on the application of CEQA after the December 5, 1972, legislation was passed. This simplistic argument is wrong. Public Resources Code section 21169 declares valid, notwithstanding a failure to comply with CEQA, those permits issued between the time CEQA was enacted and December 5, 1972. (Pub. Resources Code, § 21169.)

Here, however, the Water Agencies are not arguing that the regional water pollution control board should have complied with CEQA before issuing Resolution No. 60-22 in 1960. Instead, their action concerns the board's decision in 1995 to issue Order No. 95-151, which approved ALR's request to be classified as a Class III landfill authorized to accept 3,200,000 tons of waste.

Moreover, Resolution No. 60-22 is not "otherwise legal and valid." The Regional Board amended it in 1968 pending implementation of Chapter 15 regulations (Order No. 86-59), rescinded it in 1988 (Order No. 88-133), and rescinded it again in 1995 by issuing the order that is the subject of this action. (Order No. 95-151; *Aries Dev. Co.* v. *California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534, 547 [122 Cal.Rptr. 315] ["[S]ection [21169] only validated permits issued before December 5, 1972, 'if otherwise legal and valid.' "])

The cases interpreting Public Resources Code section 21169 confirm that its purpose was simply to prevent CEQA challenges to permits issued between the date CEQA was enacted and December 3, 1972. Indeed, *every one* of the reported decisions discussing Public Resources Code section 21169 involves such a permit. (See, e.g., *Cooper* v. *County of Los Angeles* (1975) 49 Cal.App.3d 34 [122 Cal.Rptr. 464] [zoning ordinance issued on July 15, 1971]; *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712 [117 Cal.Rptr. 96] [zoning change on Apr. 20, 1971]; *Pacific Palisades Property Owners Assn.* v. *City of Los Angeles* (1974) 42 Cal.App.3d 781 [117 Cal.Rptr. 138] [building permit issued on September

28, 1972].) There has not been any reported decision since 1977 that has even mentioned Public Resources Code section 21169, the last being *Cooper v. County of Los Angeles, supra,* 69 Cal.App.3d 529, which concerned a zoning ordinance effective July 15, 1971. In short, courts have never applied Public Resources Code section 21169 as ALR seeks to have it applied here—to prevent environmental review of a permit or entitlement for use issued for a private project long *after* December 1972, merely because the use was once before approved before CEQA was enacted in 1970. We likewise decline ALR's invitation to make such an application.

Furthermore, courts interpreting Public Resources Code section 21169 have recognized that it "in part constitute[s] a codification of the doctrine of 'vested rights,' which doctrine has been recognized as permitting a land-owner to complete a project in the face of a new law purporting to prohibit the development of the project where the landowner, in reliance upon governmental action, has in good faith suffered substantial detriment thereby acquiring a 'vested right' to proceed to develop the property." (*Cooper v. County of Los Angeles, supra,* 49 Cal.App.3d 34, 42.) The Porter-Cologne Water Quality Act expressly provides, however, that "No discharge of waste into the waters of the state, whether or not the discharge is made pursuant to waste discharge requirements, shall create a vested right to continue the discharge. All discharges of waste into waters of the state are privileges, not rights." (Wat. Code, § 13263, subd. (g).) Contrary to ALR's implicit claim, ALR did not obtain any "vested right" to continue polluting the Basin just because it has been doing so for a long time.

B. *Guidelines section 15261, subdivision (b)(3) is invalid to the extent it attempts to extend the statutory exemption.*

 Although ALR claims a "statutory exemption" applies, it fails to discuss the applicable statute, Public Resources Code section 21169, and instead relies on Guidelines section 15261, subdivision (b)(3), which provides: "Where a private project has been granted a discretionary governmental approval for part of the project before April 5, 1973, and another or additional discretionary governmental approvals after April 5, 1973, the project shall be subject to CEQA only if the approval or approvals after April 5, 1973, involve a greater degree of responsibility or control over the project as a whole than did the approval or approvals prior to that date." (Guidelines, § 15261, subd. (b)(3).) Guidelines section 15261, subdivision (b)(3) exceeds the scope of CEQA and is, therefore, to that extent, invalid. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 205 [132 Cal.Rptr. 377, 553 P.2d 537] ["[N]o regulation is valid if its issuance exceeds the scope of the enabling statute."].)

First, Public Resources Code section 21169 prevents a project opponent from challenging, for failure to comply with CEQA, the issuance of a permit or entitlement for use after CEQA was enacted, but before December 5, 1973. Section 21169 does not mention or concern "another or additional discretionary . . . approval . . . *after April 5, 1973*," whether or not the subsequent approval involves a "greater degree of responsibility or control over the project." While the discussion to Guidelines section 15261 asserts that this language is simply "administrative interpretation," this interpretation can only be deciphered as creating an exemption from CEQA.

Second, Guidelines section 15261, subdivision (b)(3) is unauthorized and conflicts with Public Resources Code section 21084, which authorizes the Secretary of the Resources Agency, and not the Office of Planning and Research, to grant an exemption from CEQA for projects. Guideline section 15261 was prepared by the Office of Planning and Research, and while Public Resources Code section 21083 authorizes that office to prepare guidelines on certain subjects,[12] identifying projects exempt from CEQA is not one of them. Instead, Public Resources Code section 21084 instructs the Secretary of the Resources Agency[13] to create a list of exempt classes of projects that it has found do not have a significant effect on the environment. (Pub. Resources Code, § 21084.)

The Office of Planning and Resources therefore did not have authority to draft Guidelines section 15261, subdivision (b)(3) to exempt those projects subject to another discretionary approval after April 5, 1973, where the subsequent approval does not involve a greater degree of responsibility or control. The Secretary of the Resources Agency has never found that such projects do not have a significant effect on the environment.

C. *Even if valid, Guidelines section 15261, subdivision (b)(3) is inapplicable.*

The references for Guideline section 15261 are Public Resources Code sections 21169 and 21171 and *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377]. (Guidelines, § 15261.) None of these references

---

[12]The Office of Planning and Research (OPR) was established by the Planning and Zoning Law of 1951. CEQA directs OPR to prepare "objectives and criteria for the orderly evaluation of projects," "include criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment,' " and "include procedures for determining the lead agency." (Pub. Resources Code, § 21083.)

[13]The Resources Agency consists of the Departments of Conservation, Fish and Game, Forestry and Fire Protection, Navigation and Ocean Development, Parks and Recreation, and Water Resources. (Gov. Code, § 12805.)

mention or concern an agency's approval of a private project after 1973 that "involve[s] a greater degree of responsibility or control." No case discusses what Guidelines section 15261, subdivision (b)(3) means. The interpretation of Guidelines section 15261, subdivision (b)(3) is, therefore, a matter of first impression.

■ Regulations should be construed in light of the enabling statute's intent and the general policies underlying the statutory scheme. (*Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467 [277 Cal.Rptr. 481]; *Industrial Indemnity Co.* v. *City and County of San Francisco* (1990) 218 Cal.App.3d 999 [267 Cal.Rptr. 445].) The purpose of CEQA in general is well established: "to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d at p. 259.) "With *narrow* exceptions, CEQA requires an EIR whenever a public agency proposes to approve . . . a project that may have a significant effect on the environment." (*Laurel Heights Improvement Assn.* v. *Regents of California, supra*, 47 Cal.3d 376, 390, italics added.)

■ Thus, if Guidelines section 15261, subdivision (b)(3) is not invalid, it must be interpreted narrowly, consistent with the purpose of CEQA. In this case, Order No. 95-151 clearly involves a "greater degree of responsibility or control" over ALR's activities than did the regional water pollution board's 1960 resolution, and the Guideline "exemption" therefore does not apply.

The Regional Board in 1995 has substantially more *responsibility* over the unlined 80-acre area than the regional water pollution board did in 1960. In 1960, the pollution board did not have any authority to stop Azusa Rock and Sand Company from filling the quarry with sewage and waste. In 1995, the water board not only had the authority but, under the 1982 emergency legislation and 1984 regulations, the duty to prohibit the disposal of msw at the site unless the landfill ensured no impairment of the Basin. Moreover, as the legislative history shows, the Porter-Cologne Water Quality Act was enacted in part because "the enforcement provisions in the current Water Quality Control Act are *totally inadequate*," and "statutory restriction has made enforcement *practically impossible*."

The 23-page Order No. 95-151 also involved substantially greater *control* over the unlined 80-acre area than did the 4-page Resolution No. 60-22. Order No. 95-151, for example, ordered ALR to install gas extraction wells, to develop a detection monitoring program including construction of groundwater and landfill gas monitoring wells, to develop a workplan to evaluate

background water quality, to conduct a periodic load-checking program, to cover wastes at the end of each operating day, and to submit a master plan describing the long-term uses of the entire 302-acre site. None of these requirements were in Resolution No. 60-22.

D. *The Water Agencies' claims are not time barred and collateral estoppel does not apply.*

■■■ ALR also claims that, because the Regional Board found that the "ongoing project" exemption applicable when it issued Order No. 86-59, that decision is "final" and any challenge to it is barred by the statute of limitations. ALR confuses the statute of limitations with the defense of res judicata or collateral estoppel. Because the Water Agencies are not challenging Order No. 86-59, no issue is raised whether such a claim would now be timely. It appears, instead, that ALR is attempting to argue that the Regional Board's finding in 1986 that Order No. 86-59 was exempt from CEQA is entitled to preclusive effect now.

However, although an agency's decision can, in certain circumstances, be given preclusive effect, it is clear that ALR has not and cannot meet its burden of proving the prerequisites here. (*Vella* v. *Hudgins* (1977) 20 Cal.3d 251, 257 [142 Cal.Rptr. 414, 572 P.2d 28] ["The burden of proving that the requirements for application of res judicata have been met is upon the party seeking to assert it as a bar or estoppel."].)

First, a court may only give collateral estoppel effect to a final decision of an "agency . . . acting in a judicial capacity." (*Brosterhous* v. *State Bar* (1995) 12 Cal.4th 315, 324 [48 Cal.Rptr.2d 87, 906 P.2d 1242].) Courts look "for factors indicating that the administrative proceedings and determination possessed a ' "judicial" character.' " (*People* v. *Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321].) ALR presented no evidence to the trial court (or this court) to show that, when it issued Order No. 86-59, the Regional Board was acting in a judicial capacity at all. To the contrary, Order No. 86-59 says that it issued after "a public meeting." State Board regulations specify rules for "meetings" (Cal. Code Regs., tit. 23, § 647 et seq.), as opposed to "adjudicatory proceedings." (Cal. Code Regs., tit. 23, § 648 et seq.) Therefore, what little evidence there is on this point indicates that the Regional Board did not issue an order after an adjudicatory proceeding.

Second, ". . . the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d

1223, 2 A.L.R.5th 995].) Again, ALR does not refer to any evidence that shows that *any* of the respondents in this appeal were "parties" to the proceedings that resulted in Order No. 86-59 or in privity with anyone who was a party.

Third, the issue "must have been actually litigated in the former proceeding." (51 Cal.3d at p. 341.) "A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action." (Rest.2d, Judgments, § 27, com. e, p. 256.) ALR has not and cannot point to any evidence to show that anyone in 1986 actually litigated the issue whether the unlined 80-acre area was an "ongoing project" exempt from CEQA.

Fourth, the issue "must be identical to that decided in a former proceeding." (*Lucido* v. *Superior Court, supra,* 51 Cal.3d at p. 341.) The issue in 1986 was whether to *limit* ALR's disposal of waste until the 1984 regulations could be implemented at the site. The issue in 1995 was whether to classify the unlined 80-acre area as a Class III landfill pursuant to the 1984 regulations and to allow ALR to fill up its newly discovered capacity with 3,200,000 tons of municipal garbage. The proof that the issue in 1986 was different than the issue in 1995 is that the Regional Board did not purport to rely on the "ongoing project" exemption in 1995.

V

DISPOSITION

The judgment is affirmed. Respondents to recover costs of appeal.

Johnson, Acting P. J., Armstrong, J.,* concurred.

A petition for a rehearing was denied March 13, 1997, and appellant's petition for review by the Supreme Court was denied May 21, 1997.

---

*Associate Justice of the Court of Appeal, Second District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.