Filed 10/7/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SUNFLOWER ALLIANCE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF CONSERVATION et al., <br><br> Defendants; <br><br> REABOLD CALIFORNIA, LLC, <br><br> Real Party in Interest and Appellant. | A167698 <br><br> (Contra County <br> Super. Ct. No. N221503) <br><br> **ORDER DENYING RESPONDENT'S PETITION FOR REHEARING AND MODIFYING OPINION** <br><br> **[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

Respondent's petition for rehearing is DENIED.  The opinion filed on September 6, 2024, shall be MODIFIED as follows:

1. On page eight, in the first sentence of the first full paragraph, the misspelled word "Categorial" is deleted and replaced with: Categorical.

2. On page 13, footnote four is deleted.

3. On page 13, after the first partial paragraph, two new paragraphs are added to read:

1

In a petition for rehearing, Sunflower argues that the Secretary could not have intended to require an assessment of the project's environmental impacts at this early stage in the process, i.e., when determining whether a project is exempt.  Sunflower is wrong.  Numerous categorical exemptions require the agency to do so.  Additionally, agencies have a duty to consider a project's environmental impacts when evidence in their records suggests the possibility that it may trigger an exception to a categorical exemption.  (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1103; guidelines, § 15300.2, subds. (b), (c).)

These requirements are simply limits that the Secretary has placed on the exemptions.  Together with other limits, they restrict the categories to projects that the Secretary is confident will not cause impacts, which is consistent with the purpose of categorical exemptions, as explained above.  (See, e.g., guidelines, § 15301 ["minor alternation[s]"]; *Azusa, supra*, 52 Cal.App.4th at p. 1194 ["a 'minor' alteration cannot be an activity that creates a reasonable possibility of a significant environmental effect"]; *World Business Academy v. State Lands Com., supra,* 24 Cal.App.5th at p. 496 [an agency's adoption of an exemption " 'necessarily includes an implied finding that the project has no significant effect on the environment' "].)

4. On page 13, after the third sentence of the first new paragraph added above ("Numerous . . . to do so."), a new footnote four is added to read:

The following categorical exemptions require agencies to evaluate various potential environmental consequences of a project when determining whether the exemption applies: guidelines, sections 15306 ("serious or major disturbance to an environmental resource"); 15316, subdivision (b) ("change" to an area's "natural condition" or "substantial adverse change in the significance of the historic or archaeological resource"); 15328, subdivisions (b) ("change" to rate, temperature, dissolved oxygen, or

2

timing of stream flows), (d) (change to reservoir's "normal maximum surface elevation"), (e) ("significant upstream or downstream passage of fish affected by the project"), (g) (violations of water quality standards), (i) (construction "in the vicinity of any endangered, rare, or threatened species"); 15332, subdivision (d) ("significant effects relating to traffic, noise, air quality, or water quality"); 15333, subdivisions (a) ("significant adverse impact on endangered, rare or threatened species or their habitat"), (b) ("hazardous materials at or around the project site that may be disturbed or removed"), (c) ("impacts that are significant when viewed in connection with the effects of past . . . current . . . [or] future projects"). The exemption for minor alterations to land uses language similar to section 15301: "Minor temporary use of land having negligible or no permanent effects on the environment." (Guidelines, § 15304, subd. (e).) We note that the Secretary did not use uniform terminology across all of these categorical exemptions but instead tailored the language in each category to describe the relevant concern.

5. On page 14, the final paragraph of subsection "2." is deleted and replaced with:

   Accordingly, this limited type of well conversion fits within the Class 1 exemption.

6. On page 14, the first paragraph of subsection "3." is deleted and replaced with:

   Next, we conclude that substantial evidence supports CalGEM's use of the Class 1 exemption for this project.

7. On page 14, the second paragraph of subsection "3.," which continues into page 15, is modified to read:

   Sunflower baldly says that "no evidence in the record supports a conclusion that this change in use was negligible." But it ignores the regulatory agencies' conclusions and the substantial evidence that supports

them. (See *Save the El Dorado Canal v. El Dorado Irrigation Dist.* (2022) 75 Cal.App.5th 239, 263 [CEQA petitioner forfeits argument based on substantial evidence if it fails to lay out evidence favorable to agency finding].)  That evidence shows the agencies performed a detailed and conscientious review, and it amply supports CalGEM's findings that the Class 1 exemption is appropriate and that the project will have no significant environmental effects.  (See *World Business Academy v. State Lands Com., supra,* 24 Cal.App.5th at p. 496.) Indeed, Sunflower does not dispute that almost 1,000 vertical feet of shale would confine the injected water to the aquifer.  It does not argue that the agencies made a mistake.  Moreover, it has expressly waived any challenge to CalGEM's factual finding that there is nothing unusual about this particular Class II well, or the aquifer's geology, that may cause significant environmental impacts.  (See guidelines, § 15300.2, subd. (c) [unusual circumstances exception]; *San Francisco Beautiful, supra,* 226 Cal.App.4th at p. 1022 [agency's adoption of categorical exemption constitutes implied finding that no exception exists].)

8. On page 16, the first paragraph is modified to read:

Second, Sunflower notes that, in CalGEM's initial review of the application, it requested more details on how "fluids would be prevented from migrating upwards through [a] non-sealing fault."  This is one of many questions the regulatory agencies raised on a variety of technical issues early in their review.  The agencies then reviewed additional data on aquifer pressure "to demonstrate the sealing nature of the fault," a revised cross section of the fault showing that it terminated within the shale layers, and an analysis by Reabold's geologist. Based on this information, CalGEM concluded that "the fault is sealing."  The Regional Board also looked at the issue, and it requested, and received, a requirement to conduct a pressure test to confirm the analysis.  The board then stated that all its "concerns identified during its technical review of this Project have

4

been resolved." Sunflower presents no basis to disregard the technical conclusions of these expert agencies.

9.  On page 17, in the third sentence of the first partial paragraph (which begins on page 16), the misspelled word "categorial" is deleted and replaced with: categorical.

10.  On page 17, the citation at the end of the first full paragraph is deleted and replaced with: (*Id.* at p. 824; see also, *Historic Architecture Alliance v. City of Laguna Beach* (2023) 96 Cal.App.5th 186, 208 [changes to project design to comply with existing standards were not improper mitigation measures].)

11.  On page 18, the first full paragraph is deleted and replaced with the following new paragraphs:

In its petition for rehearing, Sunflower argues that CalGEM should be required to reconsider its decision because the record does not show that CalGEM found the well expansion to be "negligible." But CEQA does not require an agency to make findings when deciding a project is exempt. (See *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1385-1386.) We have no power to impose new procedural requirements. (Pub. Resources Code, § 21083.1.) We must affirm CalGEM's decision because it is supported by substantial evidence and the agency followed the correct process. (Pub. Resources Code, § 21168.5.)

We have no need to reach the parties' other arguments, including Reabold's contention that the court should defer to CalGEM's regulation for Class 1 exemptions. (Cal. Code Regs., tit. 14, § 1684.1.)

5

The modifications make no change to the judgment.

BURNS, J.

WE CONCUR:

SIMONS, ACTING P.J.
CHOU, J.

*Sunflower Alliance v. Reabold California LLC (A167698)*

6

Contra Costa County Superior Court, No. N221503, Hon. Edward G. Weil.

Aqua Terra Aeris Law Group, Jason R. Flanders and Theresa M. Trillo for Plaintiff and Respondent.

Environmental Law Clinic, Deborah A. Sivas, Amanda Zerbe, Luke Norquist, and Kevin K. Wang for Center for Biological Diversity as Amicus Curiae on behalf of Plaintiff and Respondent.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Christina Bull Arndt, Supervising Deputy Attorney General, and Leena M. Sheet and Jackie K. Vu, Deputy Attorneys General, for Defendant.

Paul Hastings LLP, Navi Singh Dhillon, Christopher J. Carr, and Dylan J. Crosby for Real Party in Interest and Appellant.

Alston & Bird LLP, Jeffrey D. Dintzer, Jeffrey P. Carlin, and Ytran L. Hoang for Western States Petroleum Association as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Filed 9/6/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SUNFLOWER ALLIANCE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CONSERVATION et al.,<br><br>　　　Defendants;<br><br>REABOLD CALIFORNIA, LLC,<br><br>　　　Real Party in Interest and Appellant. | A167698<br><br>(Contra Costa County Super. Ct. No. N221503) |

　　　The California Environmental Quality Act's regulatory guidelines provide an exemption from CEQA for minor alterations of an existing facility if the project involves only "negligible or no expansion" of the facility's use.  (Cal. Code Regs., tit. 14, § 15301.)[1]  The Department of Conservation's Division of Geologic Energy Management (CalGEM) invoked the exemption in approving a project to convert an oil well, which formerly pumped oil and water from an aquifer, into an injection well, which would pump excess water back into the aquifer.  The project requires only minor alterations of the well.  The question

---

　　　[1] All references to "CEQA" are to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.).  All references to "guidelines" are to the state CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.).

1

is whether injecting water, rather than pumping it, constitutes a negligible expansion of the well's former use.

We conclude that any expansion of the well's use is negligible because, under the facts here, the environmental risks of injecting the water are negligible. The well conversion project falls within the exemption. Because the trial court concluded otherwise, we reverse.

## BACKGROUND

### A.

CalGEM oversees California's underground injection program and, more generally, regulates oil and gas extraction in the state. (Pub. Resources Code, §§ 3000-3359; Cal. Code Regs., tit. 14, §§ 1724.3-1724.13; see *Center for Biological Diversity v. Department of Conservation* (2018) 26 Cal.App.5th 161, 165-169 (*Center for Biological Diversity*).) Underground injection projects are governed by federal and state law, both of which place strict limitations on the type of injection well at issue here.

The federal Safe Drinking Water Act protects the nation's drinking water supply. (See 42 U.S.C. § 300f et seq.) Federal regulations bar injection into an aquifer unless the Environmental Protection Agency affirmatively exempts the aquifer from the Safe Drinking Water Act. (40 C.F.R. §§ 144.1(g), 146.4, 144.7(a) (2024).) The agency may only exempt an aquifer when, for specified reasons such as poor water quality, it determines the aquifer will never serve as a source of drinking water. (40 C.F.R. § 146.4(a)-(c) (2024); see also, Pub. Resources Code, § 3131, subd. (a)(2).) Aquifers containing significant quantities of oil are among those aquifers, making them eligible for exemption and injection. (40 C.F.R. § 146.4(b)(1) (2024).)

Oil wells commonly pump several barrels of water (called "produced water") with each barrel of oil. Well operators separate the oil from the produced water, but they then must

2

dispose of the water, which may be very poor quality.  One common solution is to inject the water back into an exempt oil-bearing aquifer, using what both federal and state law deem a Class II well.  (40 C.F.R. § 144.6(b)(1) (2024); Pub. Resources Code, § 3130, subd. (b).)

CalGEM, in consultation with the State Water Resources Control Board and the Regional Water Quality Control Boards, reviews Class II well applications for compliance with state and federal requirements.  (Cal. Code Regs., tit. 14, § 1724.6.)  An applicant must demonstrate that the injected water will be confined by the aquifer's geology and will not escape the exempt aquifer through a well, fault, flaw in the well casing, or other pathway.  (Cal. Code Regs., tit. 14, § 1724.7.)  This requires a detailed technical review of the aquifer, the proposed injection well, and the other wells in the area, as well as the plan for injection and a monitoring system "to ensure that no damage [to the well] is occurring and that the injection fluid is confined to the approved injection zone."  (Cal. Code Regs., tit. 14, §§ 1724.7, subds. (a)-(e), 1724.7.1.)

State law bars any injection well that allows injected water to escape the exempt aquifer or that will harm people or the environment: "An underground injection project shall not cause or contribute to the migration of fluid outside the approved injection zone, or otherwise have an adverse effect on the underground injection project or cause damage to life, health, property, or natural resources."  (Cal. Code Regs., tit. 14, § 1724.8, subd. (a); see also, Pub. Resources Code, § 3131, subd. (a).)

## B.

In 2020, Reabold California LLC filed an application with CalGEM to convert a former oil well into a Class II injection well. The well is in the Brentwood Oil Field, a large oil and gas field in Contra Costa County.  The well was drilled in 1963, operated as

3

an oil well for over 20 years, then plugged.  The well is more than 4,000 feet deep.

Since 1963, dozens of wells in the Brentwood field have together pumped over 33 million barrels of water and 3.6 million barrels of oil from the aquifer.  In 1982, the Environmental Protection Agency exempted the aquifer from the Safe Drinking Water Act, making it eligible for Class II injection wells.  (See 40 C.F.R. § 146.4(b)(1) (2024).)  Two wells have been injecting produced water back into the aquifer—about 9.4 million barrels so far.

Reabold operates two nearby oil wells that produce about 300 barrels of water per day from an adjacent oil-bearing aquifer.  Currently, Reabold trucks the produced water to a disposal site 32 miles away, 10 times per week.  Injecting the water would eliminate these trips.

Reabold proposed minor changes to the proposed injection site—it would remove the well plug, install injection equipment inside the existing well, and use the existing well pad and access road.  The site is sparsely vegetated.

Reabold's application includes a technical report from an engineer, a geologist, and a hydrogeologist, with supporting analyses, data, maps, well logs, lab reports, history, and other information required by CalGEM.  The report concludes that the injected water would be confined to the aquifer by thick layers (about 1,000 vertical feet) of shale.  In the general area there are 22 wells that supply water for domestic or agricultural purposes, the deepest of which is 500 feet deep.  None of them penetrates the oil aquifer (3,938 feet deep) or the protective layers of shale.

Three regulatory agencies—CalGEM, the State Water Resources Control Board, and the Regional Water Quality Control Board—reviewed Reabold's application.  They posed detailed questions and requested additional data in several

4

rounds of discussions. Eventually, the Regional Board confirmed that the aquifer is exempt, concluded that all its concerns had been resolved, and allowed the project to proceed. CalGEM also approved the project, with several regulatory conditions.

Regarding CEQA, CalGEM found that the project fits within the Class 1 categorical exemption as a "minor alteration" of an existing facility involving "negligible or no expansion" of the well's former use. (Guidelines, § 15301.) By regulation, CalGEM has determined that minor well conversions and injection projects may fall within the Class 1 exemption (Cal. Code Regs., tit. 14, § 1684.1). According to CalGEM, the exemption is applied on a case-by-case basis after a fact-intensive inquiry.

In this instance, CalGEM observed, in its notice of exemption, that Reabold's injection equipment would be installed within the existing well boring and would require no significant surface equipment or new wells. The project would eliminate the need for routine trucking of the produced water, and it would inject water to the aquifer "cleaner than when it was removed."

## C.

Sunflower Alliance filed a petition for writ of mandate challenging CalGEM's use of the categorical exemption. On the merits, the trial court said it was inclined to agree with CalGEM and Reabold that the physical modifications to the well are minor and fit within the exemption. But the court agreed with Sunflower that the Class 1 exemption did not apply because—as injection is a "significantly different use"—it was "not convinced that changing an oil and gas well into a water injection well involves negligible or no expansion of use."

The court entered judgment in favor of Sunflower and issued a peremptory writ of mandate directing CalGEM to set aside its notice of exemption and its approval of the project.

5

Reabold appealed; CalGEM complied with the writ and rescinded both its notice of exemption and its project approval letter.[2]

## DISCUSSION

### A.

We begin with a brief overview of categorical exemptions.

CEQA embodies a strong public policy of environmental protection. (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285 (*Tomlinson*).) It establishes a three-step process. First, the lead agency determines whether a proposed action is a "project" within the meaning of the statute. (*Id.* at p. 286; Pub. Resources Code, § 21065.) If so, in the second step, the agency determines whether the project is exempt from CEQA. (*Tomlinson*, at p. 286.) If it is exempt, no further environmental review is required. (*Ibid.*) If it is not exempt, the agency proceeds to the third step—evaluating the project's environmental impacts, which may include preparing an environmental impact report. (*Ibid.*)

This case concerns the second step—determining whether an exemption applies to the project. Categorical exemptions define classes of projects that, by regulation, the Secretary of the Natural Resources Agency (Secretary) has determined do not

---

[2] Although CalGEM chose to comply with the writ, Reabold is free to pursue an appeal. (See *Santa Rita Union School Dist. v. City of Salinas* (2023) 94 Cal.App.5th 298, 324-325.) CalGEM, however, filed a respondent's brief on the merits and argues that the project is exempt. Sunflower asks us to strike the brief on the ground that CalGEM is not a proper respondent. Sunflower appears to be correct. (See Code Civ. Proc., § 902.) Regardless, we accept CalGEM's brief as an amicus curiae brief. (Cal. Rules of Court, rule 8.200(c)(7).)

We deny, as irrelevant to the issues in this appeal, the requests for judicial notice filed by Reabold, CalGEM, and Sunflower, which relate to an issue we do not reach.

6

have a significant effect on the environment.  (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*); Pub. Resources Code, § 21084; guidelines, §§ 15300, 15301.)  By statute, CEQA does not apply to the projects within the exempt categories.  (Pub. Resources Code, § 21080, subd. (b)(9).)

Categorical exemptions provide a measure of certainty and predictability in the context of a statute that is famously sweeping and imprecise.  Our Supreme Court suggested the idea in its seminal case *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 (*Friends of Mammoth*), disapproved on another ground in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896.  In *Friends of Mammoth,* the court interpreted CEQA's vague terms expansively to apply to private projects that require government approval, contrary to the general belief that it applied only to public projects (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1100), and the court warned that the full reach of the statute is "not immediately clear."  (*Friends of Mammoth*, at p. 271.)

Anticipating an alarmed reaction to its opinion, the court reassuringly predicted that "[f]urther legislative or administrative guidance may be forthcoming" and suggested the concept that later became categorical exemptions:  "[C]ommon sense tells us that the majority of private projects for which a government permit or similar entitlement is necessary are minor in scope . . . and hence, in the absence of unusual circumstances, have little or no effect on the public environment.  Such projects, accordingly, may be approved exactly as before the enactment of [CEQA]."  (*Friends of Mammoth, supra,* 8 Cal.3d at pp. 271-272.)

The Legislature responded to *Friends of Mammoth* by passing urgency legislation that, among other things, seized on the court's suggestion.  The Legislature directed the Secretary to adopt regulations (via the guidelines) that establish classes of projects that the Secretary has found do not have an effect on the

7

environment and are therefore exempt from CEQA. (*Berkeley Hillside, supra*, 60 Cal.4th at pp. 1100-1102; see Pub. Resources Code, §§ 21083, 21084, subd. (e).)

Categorial exemptions provide certainty for projects that occupy a precarious position—just outside of CEQA's hazy border—by clarifying that CEQA does not apply to them notwithstanding their potential effect on the environment. (See *Berkeley Hillside, supra,* 60 Cal.4th at p. 1102.) For each exempt class, "the Secretary has determined that the environmental changes typically associated with projects in that class are not significant effects within the meaning of CEQA, even though an argument might be made that they are potentially significant." (*Id.* at pp. 1104-1105.) The guidelines designate more than 30 categorically exempt classes of projects. (Guidelines, §§ 15301-15333.)

The guidelines also include exceptions to the exemptions. (Guidelines, § 15300.2; *Berkeley Hillside, supra*, 60 Cal.4th at pp. 1100-1101, 1104-1105.) When an agency determines that a project is categorically exempt, it impliedly finds that none of the exceptions applies. (*San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1022-1023 (*San Francisco Beautiful*).) An objecting party bears the burden of producing evidence that an exception does apply. (*Berkeley Hillside*, at p. 1105.)

Here, Sunflower contends that the well conversion project does not fit within the class of projects covered by the Class 1 exemption. Sunflower does not argue that any exceptions apply.

**B.**

**1.**

We must decide whether CalGEM abused its discretion when it determined that Reabold's well conversion project falls within the Class 1 categorical exemption. (Pub. Resources Code,

§ 21168.5; see *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [appellate court reviews agency's decision, not trial court's].) An abuse of discretion occurs if the agency failed to proceed in a manner required by law or its decision is not supported by substantial evidence. (Pub. Resources Code, § 21168.5)

We apply the de novo standard to CalGEM's interpretation of CEQA and the guidelines. (*Walters v. City of Redondo Beach* (2016) 1 Cal.App.5th 809, 816-817 (*Walters*).) We treat the guidelines as regulations and interpret them in the same manner that we interpret statutes, using the traditional rules of statutory construction. (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1097.) To the extent that CalGEM's decision turns on evidence in the administrative record, we apply the substantial evidence standard. (*Walters*, at p. 817.)

When interpreting a categorical exemption, moreover, we must stay within the reasonable scope of the exemption's language (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 495; Pub. Resources Code, § 21083.1) and bear in mind its commonsense purpose. (See *Friends of Mammoth, supra*, 8 Cal.3d at p. 272; *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 175 [emphasizing importance of common sense "at all levels of CEQA review"]; see generally, *Berkeley Hillside, supra*, 60 Cal.4th at pp. 1100-1102, 1107-1108.)

**2.**

Sunflower's main argument is that CalGEM misinterpreted the Class 1 exemption because well conversion projects, as a group, are outside the exemption's scope. (See *Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 360-361.)

Class 1 categorical exemptions are aimed at projects involving minor alterations of existing structures: "Class 1

consists of the operation . . . permitting . . . or minor alteration of existing . . . private structures, facilities, [or] mechanical equipment . . . involving negligible or no expansion of existing or former use." (Guidelines, § 15301.) The guidelines emphasize that "[t]he key consideration is whether the project involves negligible or no expansion of use." (*Ibid*.)

The parties disagree about whether converting an oil well to an injection well can ever involve "negligible or no expansion" of its former use. (Guidelines, § 15301.) Sunflower argues that any *new* use of a modified well is an impermissible expansion. Because the well has never been used to inject water, it says, the exemption does not apply. Reabold argues that the question is not whether the use would change but, instead, the *degree* of change. Formerly, the well pumped oil and water from an aquifer. As modified, it will inject water back into the aquifer, minus the oil. The modified well basically just reverses the process. Similarly, CalGEM equates "use" with "purpose"— whether the well is pumping or injecting, there is no change in the well's purpose to "transport fluid between the surface and subsurface."

We are not altogether sold on any of these approaches. In a sense, both sides are right: injection is a new use of the well, but it may not be a significant change. The cases cited by the parties do not address this particular situation, nor do they identify a principle or rule for resolving it. (See, e.g., *Turlock Irrigation Dist. v. Zanker* (2006) 140 Cal.App.4th 1047, 1066 [installation of water meters was not water system expansion]; *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 793-794 [requiring permits for existing parking spaces was not parking expansion]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 960, 967 [diverting large amount of water from stream for municipal use was expansion of hydro station's existing use that left water in

10

stream]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1193-1196 (*Azusa*) [landfill was not a "facility" within Class 1, and use of landfill was not a "minor" alteration].)

To find the applicable rule, we begin with the Class 1 guideline's language. If we assume (as Sunflower asserts) that injection is an "expansion" of the well's use, the key term becomes "negligible." The guideline uses this term to describe the outer limits of a permissible expansion: only a *negligible* expansion of use is exempt. (Guidelines, § 15301.) To determine the guideline's intent, we focus on the plain meaning of its language, viewed in the context of the statutory scheme. (*Berkeley Hillside, supra,* 60 Cal.4th at p. 1097; *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.) The plain meaning of "negligible" is small, unimportant, or inconsequential. (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/negligible> [as of Sept. 6, 2024].) We cannot construe "negligible" to mean that *any* new use, or change in use, is disqualifying. Such an interpretation would read "negligible" out of the guideline. (See *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1026 [" '[c]ourts should interpret statutes or written instruments so as to give force and effect to every provision' "].)

Focusing instead on the consequences of a change in use is a better approach. CEQA's objective, of course, is protecting the environment. (*Tomlinson, supra,* 54 Cal.4th at p. 285.) In this context, then, it makes sense that the term negligible is intended to allow changes or expansions in use that are inconsequential and to exclude changes in use that threaten environmental harm. In other words, when a modified project is put to a new use, the change in use is unimportant, as far as CEQA goes, if the risk of environmental harm from the new use is negligible.

11

Our interpretation finds support in the guidelines, in which the Secretary provides examples of Class 1 projects to which the exemption would apply. For instance, the Secretary states that the exemption applies to a project to modify an existing street by adding new bicycle or transit lanes, but it does not apply to new car lanes. (Guidelines, § 15301, subd. (c).) In this example, the exemption's application does not turn on whether the additional lanes—for bikes, transit, or cars—constitute a *new* use of the street. More likely the Secretary drew the line based on the degree of environmental risk produced by the change: bikes and transit do not harm air quality, but cars do.[3] (See also *id*. at subd. (n) [conversion of single family residence into office use], and *id*. at subd. (o) [installation of steam sterilization unit in existing medical waste generation facility].)

By focusing on environmental risks, our interpretation serves the purpose of categorical exemptions—to exempt from CEQA classes of projects that the Secretary has determined typically do not have a significant environmental effect. (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1104-1105; Pub. Resources Code, §§ 21083, 21084.) It also appeals to common sense for the Secretary to exempt minor modifications to existing

---

[3] Similarly, the modifications themselves can also cause environmental impacts when they are not "minor." (Guidelines, § 15301; see, e.g., *id*., subd. (e) [exempting minor additions to existing structures, based on size and nature of the modifications]; *Azusa*, *supra*, 52 Cal.App.4th at p. 1194 ["a 'minor' alteration cannot be an activity that creates a reasonable possibility of a significant environmental effect"].) Interestingly, the exemption applies to the demolition of three or fewer residences in urban areas—which might seem like a major alteration to the residences but presumably is minor in the sense that it poses few environmental risks. (Guidelines, § 15301, subd. (l)(1).) Together, the limits on modifications and use generally constrain the exempt class to modest, low-risk modification projects.

projects that pose a negligible threat to the environment. (See *Friends of Mammoth, supra*, 8 Cal.3d at p. 272 [as a matter of "common sense," CEQA does not apply to most projects because they "are minor in scope . . . and . . . have little or no effect on the public environment"].) No purpose is served by myopically focusing on whether a use is new, thereby excluding from the exemption many projects that would cause no environmental harm— precisely the type of borderline projects for which categorical exemptions are useful.[4]

The question remains whether converting a former oil well to an injection well falls within the scope of the exemption. As explained, we reject Sunflower's blanket argument that the exemption never applies to this kind of project because the change in use (injecting rather than pumping) is new. We conclude that the exemption is appropriate for the relatively modest type of conversion project at issue here.

First, with respect to the physical modifications to the well itself, Sunflower does not dispute (and the trial court agreed) that the project fits within the Class 1 guideline because it only includes "minor alteration[s]" to "existing . . . equipment." (Guidelines, § 15301.) We agree as well. The conversion entails only modest alterations to the existing well. The project makes no significant changes to existing roads, the well pad, or surrounding vegetation, nor does it entail complicated modifications, deepening, or reconstruction of the well.

---

[4] We also note that agencies routinely evaluate potential environmental impacts at this early stage of the CEQA process. Before invoking a categorical exemption, for example, agencies have a duty to consider a project's environmental impacts when evidence in their records suggests the possibility that it may trigger an exception to the exemption. (*Berkeley Hillside, supra,* 60 Cal.4th at p. 1103; guidelines, § 15300.2, subds. (b), (c).)

Second, the change in the well's use is negligible. The well formerly pumped oil and water from an exempt aquifer. Once converted to a Class II injection well, it would inject water into the same aquifer. The new use is limited to the disposal of produced water. It will not involve any other uses, such as fracking, that may pose significant environmental risks. (See Pub. Resources Code, §§ 3152, 3160.) Part and parcel of the project's approval as a Class II well is a regulatory determination that the injected water cannot escape the aquifer and harm people, property, or the environment because the injected water will be geologically confined within the aquifer. (Cal. Code Regs., tit. 14, § 1724.8, subd. (a); see also, Pub. Resources Code, § 3131, subd. (a).) The environmental risks of the conversion are negligible.

Accordingly, we cannot say that this type of well conversion is categorically outside the scope of the Class I exemption.

**3.**

Next, we reject Sunflower's argument that substantial evidence does not support CalGEM's use of the Class 1 exemption for this project.

Sunflower baldly says that "no evidence in the record supports a conclusion that this change in use was negligible." But it ignores the regulatory agencies' conclusions and the substantial evidence that supports them. (See *Save the El Dorado Canal v. El Dorado Irrigation Dist.* (2022) 75 Cal.App.5th 239, 263 [CEQA petitioner forfeits argument based on substantial evidence if it fails to lay out evidence favorable to agency finding].) Sunflower does not dispute that almost 1,000 vertical feet of shale would confine the injected water to the aquifer. It does not argue that the agencies made a mistake. Moreover, it has expressly waived any challenge to CalGEM's factual finding that there is nothing unusual about this particular Class II well, or the aquifer's geology, that may cause significant

14

environmental impacts. (See guidelines, § 15300.2, subd. (c) [unusual circumstances exception]; *San Francisco Beautiful*, *supra*, 226 Cal.App.4th at p. 1022 [agency's adoption of categorical exemption constitutes implied finding that no exception exists].)

Instead, at most, Sunflower briefly raises concerns that there "may" be significant adverse impacts although it is "unclear." Even if Sunflower had not forfeited the issue, we are not persuaded.

First, Sunflower questions whether the injected water will harm the aquifer's water quality. It asserts that the injected water is somewhat more saline than the aquifer, but it does not explain why any difference in the injected water's salinity matters.[5] Similarly, Sunflower speculates the aquifer may be harmed by a corrosion inhibitor added to the injected water. This is pure conjecture—the record simply has no details on the nature or amount of the additive, much less any effect (good, bad, or immaterial) on the already poor-quality water in the aquifer. (See *Walters*, *supra*, 1 Cal.App.5th at p. 819.) Adding a corrosion inhibitor is presumably intended to prevent the well from leaking. (See Cal. Code Regs., tit. 14, § 1724.7, subd. (a)(3)(G).) The administrative record does not support Sunflower's speculation about harm to the aquifer.

---

[5] In any case, the record does not appear to support Sunflower's assertion. Sunflower points to a reviewer's comment that the produced (injected) water "appears" to have higher total dissolved solids (2,600 parts per million, or ppm) than the aquifer (1,712 ppm). But the reviewer seems to have mixed up two different measurements of salinity. The 1,712 ppm figure is for sodium chloride. Sodium and chloride are merely components of the total dissolved solids. We were unable to find a measurement of the aquifer's total dissolved solids for comparison.

15

Second, Sunflower notes that, in CalGEM's initial review of the application, it requested more details on how "fluids would be prevented from migrating upwards through [a] non-sealing fault." This is one of many questions the regulatory agencies raised on a variety of technical issues early in their review. Later, based on additional analysis, CalGEM was satisfied that "the fault is sealing." The Regional Board also looked at the issue, and it requested, and received, a requirement to conduct a pressure test to confirm the analysis. The board then stated that all its concerns had been resolved. Sunflower presents no basis to disregard the technical conclusions of these expert agencies.

We conclude that substantial evidence—including the detailed technical review by CalGEM and the water boards—supports CalGEM's determination that the project fits within the Class 1 exemption.

## C.

Lastly, we reject Sunflower's argument that CalGEM improperly imposed mitigation measures to eliminate the project's (alleged) environmental impacts.

CalGEM adopted a number of conditions as part of its approval of the Class II well. (See Cal. Code Regs., tit. 14, § 1724.6, sub. (b).) Sunflower asserts vaguely that "numerous conditions" are, in reality, mitigation measures that CalGEM adopted so that the project would qualify for a categorical exemption. In its brief, Sunflower does not discuss any particular condition. At oral argument, it identified a condition (mentioned above) that the Regional Board had requested—a pressure test related to a fault.

An agency may not evade CEQA by adopting mitigation measures simply to qualify a project for a categorical exemption. (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1102 (*Salmon Protection*).) In

16

*Salmon Protection*, a county acknowledged a residential construction project may have potential adverse impacts on adjacent stream habitat. It then adopted numerous conditions expressly to mitigate the impacts and thereby qualify the project for a categorial exemption. (*Id*. at p. 1104.) The court of appeal pointed out that mitigation measures, under CEQA, are only proper at later stages of the process, which the county evaded by prematurely adopting mitigation measures. (*Id*. at pp. 1107-1108; see also *Azusa, supra*, 52 Cal.App.4th at pp. 1200-1202.)

An agency may, however, impose conditions on a project that address environmental issues for legitimate reasons without running afoul of CEQA. (See *Protect Telegraph Hill v. City and County of San Francisco* (2017) 16 Cal.App.5th 261, 267-268; *San Francisco Beautiful, supra*, 226 Cal.App.4th at pp. 1032-1033.) In *Walters, supra*, 1 Cal.App.5th at pp. 823-824, the court held that a city properly adopted conditions requiring a carwash to ensure noise levels meet existing regulatory standards, to conduct tests to verify that the standards are met, and to make any necessary modifications prior to commencing operations. By requiring the project to meet the standards, the city simply took a " 'belt and suspenders' approach" to ensure that the project would cause no significant impacts. (*Id*. at p. 824.)

This case is like *Walters*. The pressure test, like the noise test in *Walters*, ensures that the project meets the existing regulatory standards for Class II wells. Those standards require a Class II well to be operated so that injected water remains within a specified zone in the aquifer and cannot escape through any pathway, such as a fault. (Cal. Code Regs., tit. 14, § 1724.7, subds. (a), (a)(2)(A), (a)(2)(C).) There is no significant impact to mitigate.

Indeed, Sunflower fundamentally misconstrues the nature of the conditions and the regulations. CalGEM cannot issue a permit for a Class II well that violates these standards, nor can

17

Reabold operate one. (Cal. Code Regs., tit. 14, §§ 1724.6, sub. (b), 1724.7, sub. (a).) Compliance with the standards is a legally mandated element of the project, not a CEQA measure to lessen the project's environmental impacts and shoehorn it into a categorical exemption.

In sum, Sunflower has not shown that CalGEM failed to proceed in a manner required by law or that its decision is unsupported by substantial evidence. (Pub. Resources Code, § 21168.5.) The trial court erred by concluding otherwise. We have no need to reach the parties' other arguments, including Reabold's contention that the court should defer to CalGEM's regulation for Class 1 exemptions. (Cal. Code Regs., tit. 14, § 1684.1.)

## DISPOSITION

The judgment granting Sunflower's petition for writ of mandate is reversed. The matter is remanded to the superior court with directions to enter a new judgment that (1) denies Sunflower's petition for writ of mandate; (2) recalls the court's peremptory writ of mandate requiring CalGEM to set aside its notice of exemption and approval of the project; and (3) orders CalGEM to reinstate its project approval and notice of exemption. Reabold is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (a)(2).)

BURNS, J.

WE CONCUR:


SIMONS, ACTING P.J.
CHOU, J.

*Sunflower Alliance v. Reabold California LLC (A167698)*

18

Contra Costa County Superior Court, No. N221503, Hon. Edward G. Weil.

Aqua Terra Aeris Law Group, Jason R. Flanders and Theresa M. Trillo for Plaintiff and Respondent.

Environmental Law Clinic, Deborah A. Sivas, Amanda Zerbe, Luke Norquist, and Kevin K. Wang for Center for Biological Diversity as Amicus Curiae on behalf of Plaintiff and Respondent.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Christina Bull Arndt, Supervising Deputy Attorney General, and Leena M. Sheet and Jackie K. Vu, Deputy Attorneys General, for Defendants.

Paul Hastings LLP, Navi Singh Dhillon, Christopher J. Carr, and Dylan J. Crosby for Real Party in Interest and Appellant.

Alston & Bird LLP, Jeffrey D. Dintzer, Jeffrey P. Carlin, and Ytran L. Hoang for Western States Petroleum Association as Amicus Curiae on behalf of Real Party in Interest and Appellant.